# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT P. HILLMANN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 04 C 6671** |
| **v.** | ) | |
| | ) | **Chief Judge Rubén Castillo** |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert P. Hillmann filed this action against his former employer, the City of Chicago, alleging that his termination was illegal on various grounds. Plaintiff originally brought five claims in this case, alleging breach of contract, discrimination in violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*, retaliation in violation of the ADA, political hiring and firing decisions in violation of the First Amendment of the United States Constitution, and retaliation and denial of medical benefits in violation of the Illinois Workers' Compensation Act (the "IWCA"), 820 Ill. Comp. Stat. 305/1 *et seq.* (R. 125, Third Am. Compl.) On September 26, 2007, Judge Wayne R. Andersen granted Defendant's motion for summary judgment as to the breach of contract claim, the First Amendment claim, and the denial of medical benefits portion of the IWCA claim. (R. 188, Mem. Op. and Order.) Upon Judge Andersen's retirement, this case was reassigned to Judge William J. Hibbler, (R. 247, Exec. Comm. Order), who presided over the seven-day jury trial on Plaintiff's remaining claims in June 2011, (R. 311, Min. Entry). Judge Hibbler unfortunately and prematurely passed away before he issued findings of fact and conclusions of law or a ruling on the equitable ADA retaliation claim, and the case was reassigned to this Court. (R. 338, Exec. Comm. Order.) This

Court granted Plaintiff's motion for a new trial, (R. 362, Pl.'s Mot.; R. 376, Min. Entry), which took place over seven days in April 2013, (R. 483, Min. Entry; R. 484, Min. Entry; R. 488, Min. Entry; R. 489, Min. Entry; R. 492, Min. Entry; R. 493, Min. Entry; R. 501, Min. Entry). The jury trial was simultaneously a bench trial on Plaintiff's ADA retaliation claim, and the Court used the jury in an advisory capacity as to that claim. (*See* R. 420, Min. Entry.) On April 17, 2013, the jury returned a verdict in favor of Defendant on Plaintiff's ADA discrimination claim, ADA failure to accommodate claim, and ADA retaliation claim. (R. 500, Verdict.) The jury returned a verdict in favor of Plaintiff on his claim of retaliatory discharge under the Illinois Workers' Compensation Act and assessed damages of two million dollars. (*Id.*)

Presently before the Court are: (1) Plaintiff's motion to vacate the advisory jury verdict as to Plaintiff's ADA retaliation claim (R. 503); (2) Defendant's renewed motion for judgment as a matter of law (R. 508); (3) Defendant's motion to reinstate the original jury verdict or, alternatively, for a new trial (R. 511); (4) Defendant's motion for remitter or, alternatively, for an evidentiary hearing as to damages (R. 515); and (5) Defendant's motion for the Court to issue findings of fact and conclusions of law in its favor on Plaintiff's ADA retaliation claim (R. 521). The Court begins by setting forth its findings of fact and conclusions of law as to Plaintiff's ADA retaliation claim. The basis of Plaintiff's claim of retaliation in violation of the ADA is his allegation that after each request for a reasonable accommodation for his disability, which he made "in person or through legal counsel," Defendant retaliated against him by denying merit pay increases, transferring him or creating new job duties that further injured him, and ultimately terminating him. (R. 125, Third Am. Compl. ¶ 68.)

Pursuant to Federal Rule of Civil Procedure 52, this Court hereby enters the following written Findings of Fact and Conclusions of Law, which are based upon consideration of all the

admissible evidence as well as this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be considered Findings of Fact, they shall also be deemed Findings of Fact. The Court's Conclusions of Law are limited to Plaintiff's claim of retaliation in violation of the ADA. For the sake of efficiency, however, the Court includes in its Findings of Fact facts that are pertinent to the remaining post-trial motions, which are discussed below.

## FINDINGS OF FACT

This Court concludes that Plaintiff established through both direct and circumstantial evidence, as well as reasonable inferences drawn therefrom, the following facts by a preponderance of the evidence:

## I.     General Background

1.      Plaintiff began working for the Chicago Park District in June 1973 as a park attendant. (Trial Tr. at 31:2-7.) He worked as a park attendant for approximately five and a half years and then took a job as a truck driver with the Chicago Department of Streets and Sanitation ("the Department"). (Trial Tr. at 31:10-14.)

2.      In or around November 1984, Plaintiff developed cervical radiculopathy. (Trial Tr. at 32:5-8.) Cervical radiculopathy is the interference of normal nerve function that results from pinched or compressed nerves. (Trial Tr. at 121:1-10.) This interference can cause pain, weakness, limited mobility, and the loss of sensation in a person's arm. (Trial Tr. at 121:5-14.) Cervical radiculopathy is typically a permanent condition. (Trial Tr. at 121:15-21.) Plaintiff's condition caused pain and swelling in his neck and right arm. (Trial Tr. at 32:12-14.)

3.     In 1995, Plaintiff sought an accommodation from the City to allow him to avoid repetitive work with his right arm because of his condition.  (Trial Tr. at 201:20-23.)  As part of the ensuing 1995 Agreement between Plaintiff and the City, Plaintiff was promoted to the role of Chief Timekeeper and assigned to the Bureau of Electricity (the "BOE"), a division of the Department of Streets and Sanitation.  (Trial Tr. at 52:17-20, 224:19-24, 225:8-13, 226:16-21.)

4.     Dr. Michael F. Gonzales, Plaintiff's treating physician, began treating Plaintiff for cervical radiculopathy in the mid-1980s.  (Trial Tr. at 120:12-15.)  Dr. Gonzales specializes in physical medicine and rehabilitation and pain medicine.  (Trial Tr. at 117:18-118:2.)  Between the 1995 Agreement and the year 2000, Dr. Gonzales saw Plaintiff for unrelated reasons but did not treat Plaintiff's cervical radiculopathy because it was stable and did not need treatment during that time period.  (Trial Tr. at 124:1-7, 156:2.)  In 2000, Dr. Gonzales observed "a significant change in [Plaintiff's] condition" that required further treatment.  (Trial Tr. at 124:15-125:5.)  Specifically, Plaintiff's right arm, shoulder, and hand were swelling and causing him pain.  (Trial Tr. at 124:24-125:2.)  Dr. Gonzales observed Plaintiffs condition worsening between 2000 and when he stopped seeing Plaintiff in 2002 or 2003.  (Trial Tr. at 155:23-156:4.)

## II.     Transition of Duties in the BOE

5.     In his role as Chief Timekeeper of the BOE, Plaintiff reported to Deputy Commissioner Jim Heffernan from 1995 until May 2000.  (Trial Tr. at 226:16-21, 232:22-233:5.)  Plaintiff's understanding of the 1995 Agreement was that he would not be performing all of the duties of a Chief Timekeeper.  (Trial Tr. at 227:19-22.)  The Chief Timekeeper job description listed, as examples of duties:

> Directs, coordinates and reviews departmental timekeeping functions to ensure accurate and proper reporting of information, directs and supervises a large group of clerical personnel engaged in various timekeeping and payroll administration activities; examines reports and records to verify the execution of proper

timekeeping methods; assigns and supervises a group of Supervising Timekeepers who check employees' presence an [sic] the job; represents the department at various meetings and conferences pertaining to the performance of various timekeeping and payroll activities; reviews time verification reports and payroll sheets for accuracy and to ensure proper processing; resolves complaints pertaining to timekeeping or payroll methods or procedures; maintains records and prepares various monthly progress and status reports.

(Def.'s Ex. 3.)  Plaintiff performed some of the Chief Timekeeper duties, such as preparing overtime reports, supervising a group of supervising timekeepers below him, and directing clerical personnel.  (Trial Tr. at 230:12-231:11, 236:11-15.)  He also prepared memoranda to Heffernan to inform him when employees were claiming excessive overtime pay.  (Trial Tr. at 54:16-56:12.)

6.      Additionally, Plaintiff performed duties Heffernan directly assigned to him, including conducting research, attending meetings, and writing reports associated with the project to implement the City's emergency telephone 911 system, timekeeping duties, and independent research projects Heffernan assigned.  (Trial Tr. at 231:20-232:9, 233:15-235:16.)

7.      In May of 2000, Heffernan was removed as the authority figure in the BOE and Bart Vittori assumed responsibility for the administration of the BOE.  (Trial Tr. at 58:4-7, 243:17-25.)  On August 16, 2000, Brian Murphy succeeded Heffernan as the Deputy Commissioner of the BOE.  (Trial Tr. at 844:16-845:6.)  In that position, Murphy supervised and managed employees in the BOE, and he was supervised by John Sullivan.  (Trial Tr. at 845:7-14.)

A.      **Aggravation of Plaintiff's injury**

8.      Vittori assigned Plaintiff job duties that involved handwriting and data entry and required repetitive use of his right arm.  (Trial Tr. at 58:24-59:6, 244:15-17, 245:1-6.)  Plaintiff did not immediately inform Vittori that he had any work restrictions.  (Trial Tr. at 249:3-8,

250:2-4.) In late June of 2000, Plaintiff informed Heffernan and Hugh Donlan, the BOE's

personnel liaison to the Department, that he was having problems performing the duties Vittori

assigned. (Trial Tr. at 61:23-62:12, 250:8-10.) Heffernan told Plaintiff that he had been relieved

of his authority and could not do anything to help him. (Trial Tr. at 61:23-25.) At that point,

Plaintiff believed that it was Donlan's job to notify Vittori about his restrictions. (Trial Tr. at

250:25-251:1.) Nevertheless, Plaintiff performed the tasks Vittori assigned for over two months

without telling Vittori that he was having problems. (Trial Tr. at 250:11-17.)

9.      The swelling of Plaintiff's hand and arm worsened over those two months

because of the additional data entry and writing tasks he was assigned, and on August 7, 2000,

his arm was so swollen that he could not even hold a pen, let alone perform his job duties. (Trial

Tr. at 262:20-263:11, 271:4-6.)

10.      On August 8, 2000, Plaintiff informed Vittori about his injury and told Vittori that

he could not continue to perform the tasks Vittori had assigned him. (Trial Tr. at 262:5-9.) In

response, Vittori told Plaintiff that Cliff Stevens, a supervising timekeeper in the BOE, was

being transferred, and Vittori assigned Plaintiff to take over his duties. (Trial Tr. at 262:10-12,

630:24-631:4.) At that time, there were three other supervising timekeepers in the BOE. (Trial

Tr. at 635:24-636:7.)

11.      After Plaintiff was asked to assume Stevens's job duties, he told Donlan that he

would not be able to perform all of those duties due to medical restrictions. (Trial Tr. at 636:14-

20.) Plaintiff's injury was obvious at that point, and Donlan testified that he "could physically

see that" Plaintiff had "an injury of some type." (Trial Tr. at 636:21-24.)

12.      Stevens remained in the BOE until around August 18, 2000. (Trial Tr. at 267:25-

268:2.) Thus, beginning on August 8th, when Plaintiff told Vittori he could no longer perform

his assigned duties, he reported to work but did not perform any work duties. (Trial Tr. at 268:12-269:1.)

13. On August 15, 2000, Plaintiff's counsel sent a letter to Barbara Smith in the City's Corporation Counsel's office. (Pl.'s Ex. 49.) The letter informed Smith that Plaintiff had been assigned additional duties that he was unable to perform and requested that the City continue to accommodate Plaintiff's medical restrictions pursuant to the 1995 Agreement. (*Id.*)

14. The following day, Smith had a conversation with Catharine Hennessey about Plaintiff's 1995 Agreement. (Trial Tr. at 567:6-568:4; Pl.'s Ex. 76.) Beginning in 1998, Hennessey worked for the Department as the labor relations liaison. (Trial Tr. at 520:7-15.) In that role, she was responsible for, among other things, accommodating injured employees by attempting to find them positions that they could perform with their medical restrictions. (Trial Tr. at 522:16-523:16, 827:1-7.) Hennessey knew that Plaintiff needed to be accommodated and specifically that he needed to avoid repetitive motions with his right hand. (Trial Tr. at 569:4-7; Pl.'s Ex. 76.)

15. Hennessey asked Donlan to write a job description for Plaintiff, which he did on August 18th. (Trial Tr. at 638:9-16, 639:1-11; Pl.'s Ex. 106.) The first paragraph of the memorandum described Plaintiff's duties at the time as Chief Timekeeper. (Trial Tr. at 639:12-18.) The second paragraph of the memorandum described new duties that Plaintiff would be responsible for effective August 18, 2000, when he took over Stevens's responsibilities. (Trial Tr. at 639:19-22; Pl.'s Ex. 106.) The new duties assigned to Plaintiff essentially described the job of a supervising timekeeper after the implementation of the Kronos timekeeping system. (Trial Tr. at 266:11-20, 639:23-640:3, 645:25-646:7.) They included:

> maintaining a 240-employee payroll; receiving and entering 30-35 edits per day in the Kronos system; performing a mass edit in Kronos for 90 employees who work

in the field; entering exceptions into the Kronos system; entering daily activity onto time rolls; maintaining 300 Cards; and, maintaining the Employee File Maintenance Module for said payroll.

(Def.'s Ex. 1.)  Plaintiff testified that the first paragraph "pretty much" described what he had been doing all along, but the second paragraph assigned him the job of a supervising timekeeper in addition to his Chief Timekeeper tasks and consisted of tasks he could not physically perform. (Trial Tr. at 264:19-267:1.)

**B.    Medical evaluations and Plaintiff's workers' compensation claim**

16.    On or about August 23, 2000, Plaintiff received an order, signed by Hennessey, to report to Dr. Barry Lake Fischer for a fitness-for-duty evaluation.  (Trial Tr. at 275:1-9; Pl.'s Ex. 77.)  Dr. Fischer concentrated his practice on occupational medicine—primarily pre-employment examinations and evaluation of work-related injuries.  (Trial Tr. at 420:20-22.)  When a patient was referred to Dr. Fischer for a fitness-for-duty evaluation, he would first be interviewed by a medical technician to get the relevant history, and then he would meet with Dr. Fischer to go over that information.  (Trial Tr. at 421:18-422:2.)  Dr. Fischer would then "perform a focused examination on a particular part of the body that was involved in this clinical situation."  (Trial Tr. at 422:2-4.)  To properly perform a fitness-for-duty evaluation, Dr. Fischer has to refer to a job description provided by the employer to determine if the patient is physically qualified to perform that job.  (Trial Tr. at 422:5-17.)  If Dr. Fischer found a condition that inhibited a patient's ability to perform his or her job, Dr. Fischer would recommend certain accommodations.  (Trial Tr. at 422:18-23.)

17.    Dr. Fischer diagnosed Plaintiff with probable degenerative disc disease "with clinical evidence of right cervical radiculopathy."  (Pl.'s Ex. 42.)  Dr. Fischer found that Plaintiff

had some atrophy in his arm, which indicated that Plaintiff had had cervical radiculopathy for some time.  (Trial Tr. at 429:14-430:10; Pl.'s Ex. 42.)

18.     Dr. Fischer was supplied with a job description so he could determine whether Plaintiff could or could not perform the job of Chief Timekeeper.  (Trial Tr. at 426:18-25, 582:2-6.)  Dr. Fischer determined that Plaintiff was qualified for his position as Chief Timekeeper with restrictions: limited use of his right arm in data input and lifting.  (Trial Tr. at 426:10-15; Pl.'s Ex. 40.)  Dr. Fischer faxed the results of the evaluation to Hennessey.  (Trial Tr. at 425:20-22, Pl.'s Ex. 40.)  Dr. Fischer also wrote a letter to Russell Baggett in the City's Personnel Department outlining the results of his evaluation in detail.  (Trial Tr. at 428:9-429:4; Pl.'s Ex. 42.)  Finally, Dr. Fischer recommended that Plaintiff be treated by his personal physician and that he receive an MRI of his cervical spine to determine whether or not he was a candidate for corrective surgery.  (Trial Tr. at 427:16-18, 430:11-18.)

19.     Dr. Fischer was shown the August 18th memorandum for the first time at trial. (Trial Tr. at 432:19-21.)  Dr. Fischer testified that the second paragraph, which described the new duties, was not in the job description he was given to reference when he evaluated Plaintiff for fitness for duty.  (Trial Tr. at 432:22-25.)  Dr. Fischer further testified that Plaintiff "would have difficulty doing those things."  (Trial Tr. at 433:8.)

20.     Also on August 23, 2000, Plaintiff had an appointment with Dr. Gonzales.  (Trial Tr. at 280:23-15.)  Dr. Gonzales wrote a note that Plaintiff had "a work related injury involving his neck and right upper limb.  He is to refrain from working until further notice due to his work related injury."  (Pl.'s Ex. 41.)  Plaintiff did not provide the note to anyone at the Department because he feared being put on unpaid leave.  (Trial Tr. at 289:8-16.)

21.     City employees who are injured request a "blue card," which allows the employee to see a City doctor at Mercy Works.  (Trial Tr. at 723:15-17.)  Without a blue card, an employee cannot go to Mercy Works.  (Trial Tr. at 723:18-20.)  City policy is that, without exception, a supervisor should give an employee who reports an injury at work a blue card.  (Trial Tr. at 724:9-15, 726:1-2.)  However, blue cards were not to be given out unless the injury occurred on duty or if the City "needed to find out from the City doctor if it was an injury on duty."  (Trial Tr. at 725:19-22.)

22.     On August 24, 2000, Plaintiff went to Donlan's office and requested a blue card. (Trial Tr. at 287:9-11.)  Donlan called Hennessey; after the call, Donlan told Plaintiff that he could not give him a blue card.  (Trial Tr. at 288:2-6.)

23.     On September 1, 2000, Plaintiff filed a workers' compensation proceeding with the Illinois Industrial Commission to try to get medical treatment for his injury.  (Trial Tr. at 88:21-25.)

24.     On that same day, September 1, 2000, Plaintiff was transferred within the BOE to the Construction Division.  (Trial Tr. at 89:1-8, 272:13-18.)  He was assigned to answer phones. (Trial Tr. at 290:12-15.)  Plaintiff had to use his left hand to answer phones.  (Trial Tr. at 290:18-19.)

25.     The Committee on Finance is a group comprised of City employees that oversees workers' compensation claims.  (Trial Tr. at 442:2-9.)  Dr. Gonzales was in the practice of sending bills to the Committee on Finance when he treated City employees who reported work-related injuries, such as Plaintiff.  (Trial Tr. at 125:6-17.)  Dr. Gonzales testified that normally, the Committee on Finance would mail him correspondence "either accepting responsibility for the injury and paying it, or denying responsibility for the injury."  (Trial Tr. at 126:6-16.)  He

further testified that he sent Plaintiff's bills to the Committee on Finance and advised the Committee that Plaintiff's condition was work-related. (Trial Tr. at 127:3-8.)

26.     On September 7, 2000, Dr. Gonzales sent a letter to the Committee on Finance stating that Plaintiff was "under [Dr. Gonzales's] care for treatment of injury sustained at work. The injury is a repetitive strain injury of the right upper limb." (Pl.'s Ex. 39; Trial Tr. at 129:5-130:11.) Dr. Gonzales's letter went on to explain what appropriate treatment of the condition would include and stated that it was "important that [Plaintiff's] treatment not be delayed. Significant delay in treatment will increase the likelihood that his condition will become refractory to treatment." (Pl.'s Ex. 39.) Dr. Gonzales never received a response from the Committee on Finance. (Trial Tr. at 138:18-23.)

27.     On or around September 11, 2000, Donlan forwarded to Hennessey the note from Dr. Gonzales indicating that Plaintiff had a work injury and needed medical treatment. (Trial Tr. at 641:15-642:11.)

28.     On or around October 7, 2000, Plaintiff was transferred within the BOE to the Transportation Division to answer phones. (Trial Tr. at 91:8-9, 92:4-9.) He answered phones in the Transportation Division until December 21, 2000. (Trial Tr. at 92:23-93:2, 290:20-22.) During that time, his workers' compensation claim was pending and he was unable to get medical treatment for his injury. (Trial Tr. at 93:3-8.)

29.     On December 18, 2000, Dr. Gonzales wrote another letter stating: "[Plaintiff] is impaired by injury sustained at work. This injury affects his neck and right upper limb. I am requesting that he refrain from working until further notice due to his work related injury." (Pl.'s Ex. 43; Trial Tr. at 131:18-132:5.) Dr. Gonzales testified that Plaintiff's condition "was clearly

worse, and he was getting worse as a result of the things that he was being asked to do at work." (Trial Tr. at 132:15-19.)

30.    Dr. Gonzales never received a letter from the Committee on Finance "either accepting responsibility or denying responsibility or communicating in any other way regarding [Plaintiff]." (Trial Tr. at 127:9-14.) Dr. Gonzales testified that if he had received a letter from the Committee on Finance denying liability, he could have submitted Plaintiff's bills to his health insurance company so Plaintiff could get the medical care he needed. (Trial Tr. at 174:19-175:7.) However, Dr. Gonzales's contract with Plaintiffs insurance provider barred him from filing claims for injuries that were work-related unless his employer denied liability. (Trial Tr. at 173:23-174:18.)

31.    On December 21, 2000, Donlan hand-delivered to Plaintiff a letter signed by Hennessey. (Trial Tr. at 294:6-16; Def.'s Ex. 2.) The letter states that the Department received letters from Dr. Gonzales dated August 23, 2000, and December 18, 2000, advising that Plaintiff was to refrain from working until further notice. (Def.'s Ex. 2.) The letter went on to state, in relevant part:

> Furthermore, in various conversations, you have stated that you are unable to perform the duties required of your job title as Chief Timekeeper.
>
> However, as you are aware, the duties and responsibilities of a Chief Timekeeper have changed in recent years. I have attached a current copy of your job description. With the present conditions in mind, we must inform you that the most viable option for you is to apply for a Leave of Absence, and to return to work when your physical condition allows you to perform the duties of your job title.
>
> You may also request a Work Evaluation from the Department of Personnel to determine if your physical restrictions will allow you to perform in some other capacity in another job title.

(Def.'s Ex. 2.)  Plaintiff testified that when Donlan handed him the letter, Donlan told him not to report back to work.  (Trial Tr. at 297:22-23.)

32.     Plaintiff did not apply for a leave of absence because he had already filed a workers' compensation claim with the Illinois Industrial Commission.  (Trial Tr. at 299:3-10; *see* Pl.'s Ex. 115.)  Upon receiving the letter, however, Plaintiff stopped going to work.  (Trial Tr. at 301:12-16.)

## III.     Plaintiff's Medical Evaluations

33.     On January 24, 2001, Plaintiff received a letter dated January 23, 2001, from Robert J. Serafin, the Director of Workers' Compensation in the City's Committee on Finance. (Trial Tr. at 102:4-12; Pl.'s Ex. 15.)  The letter informed Plaintiff that an MRI scan of his cervical spine and an EMG test of his upper extremities had been scheduled for him at Mercy Hospital on January 26, 2001.  (Pl.'s Ex. 15.)  The referral form for the MRI indicated that Plaintiff was referred by Dr. Damon Arnold.  (*Id.*)

34.     Dr. Arnold was the director of the occupational health network at Mercy Works. (Trial Tr. at 440:18-24.)  In that role, he oversaw the operations, supervised other physicians, and treated patients.  (Trial Tr. at 441:14-19.)  He also acted as the liaison to the Committee on Finance and consulted on workers' compensation claims.  (Trial Tr. at 442:2-9.)  Mercy Works treated patients that were injured at work and performed routine physicals and drug screens. (Trial Tr. at 441:3-7.)  The City was a major client of Mercy Works.  (Trial Tr. at 441:8-13.)

35.     Plaintiff had never seen Dr. Arnold when he received the referral.  (Trial Tr. at 103:5-12.)

36.     Between January 24th and January 26th, Plaintiff received another letter from the office of Serafin, which was dated January 24, 2001.  (Trial Tr. at 102:9-21, Pl.'s Ex. 16.)  This

letter advised Plaintiff that the Committee on Finance denied liability for medical care payments because it found his injury to be unrelated to his employment. (Trial Tr. at 748:25-749:3; Pl.'s Ex. 16.) Serafin testified that, to the best of his knowledge, the claim was denied because there was no accident report on file. (Trial Tr. at 795:3-7.)

37.    When an employee is injured, he should request his supervisor to fill out an accident report, or a First Report of Injury. (Trial Tr. at 786:24-787:6.) When a supervisor learns of an injury on the job, he is supposed to fill out a First Report of Injury. (Trial Tr. at 729:15-24.) It is then the supervisor's responsibility to send the First Report of Injury to the Committee on Finance. (Trial Tr. at 788:19-22.) Upon receipt of the Report, the Committee on Finance starts a file. (Trial Tr. at 789:1-6.) An employee's workers' compensation file is maintained by the Workers' Compensation Division of the Committee on Finance. (Trial Tr. at 784:19-21.)

38.    Alternatively, an employee can "file an adjustment of claim" with the Illinois Industrial Commission, and the Committee on Finance starts a file upon notification of that report. (Trial Tr. at 789:7-16.) Without the accident report, however, the Committee on Finance cannot process the claim and pay disability because it does not have the details of the injury, such as the date, time, description, and supervisor sign-off. (Trial Tr. at 789:17-790:3.) Thus, even if the Committee on Finance receives a Mercy Works discharge sheet indicating that an employee has a work-related injury, the Committee does not pay disability benefits until it receives a completed accident report. (Trial Tr. at 7-15.)

39.    If the Committee on Finance does not receive a First Report of Injury for an individual, there is a form to be filled out to provide information about the injury and indicate that no First Report of Injury was filed. (Trial Tr. at 757:20-25.) When Serafin filled out that

form with regards to Plaintiff, he marked Plaintiff as disabled and noted that his neck and right arm were injured. (Trial Tr. at 758:1-759:1.)

40. Serafin testified that denial letters like the one Plaintiff received were not final determinations, but could be reviewed later, as evidenced by the fact that Plaintiff was eventually paid temporary total disability. (Trial Tr. at 795:25-796:8.)

41. On January 26th, Plaintiff reported for his MRI scan with his referral from Dr. Arnold. (Trial Tr. at 104:6-11.) When it was discovered that Plaintiff had never seen Dr. Arnold and was ordered to get the scan by Serafin, Plaintiff was told that Serafin was not a doctor and he needed to see Dr. Arnold before the MRI scan could be performed. (Trial Tr. at 104:15-21, 105:1-5.) Plaintiff then made an appointment to see Dr. Arnold at Mercy Works on or around January 29th. (Trial Tr. at 104:22-25.)

42. Dr. Arnold examined Plaintiff for the first time on January 29, 2001. (Trial Tr. at 444:9-17.) Based on the examination and Plaintiff's medical history, Dr. Arnold concluded that Plaintiff had a work-related condition: radiculopathy of the upper extremity. (Trial Tr. at 444:15-445:4; Pl.'s Ex. 18.) Dr. Arnold ordered an MRI scan of Plaintiff's cervical spine for the following day, January 30th, and requested Plaintiff to return for a reevaluation on February 5th. (Pl.'s Ex. 18.) Dr. Arnold testified that the reason he ordered the diagnostic studies, the MRI scan and the electromyelogram, was to determine whether serious surgical intervention was required. (Trial Tr. at 466:1-12.)

43. The MRI scan revealed various osteophytes and a herniated disc, and it indicated multilevel disc disease. (Pl.'s Ex. 17.) Dr. Arnold testified that the results of the MRI scan supported his conclusions as to Plaintiff's cervical radiculopathy. (Trial Tr. at 447:9-11.) The significance of the MRI results was the indication "that there was something anatomical"—

specifically, degeneration and disk herniation. (Trial Tr. at 466:20-24.) Additionally, the electromyelogram revealed a delay in the nerve transmission between Plaintiff's shoulder and neck. (Trial Tr. at 466:24-467:11.) Dr. Arnold testified that the delay "could explain the feeling of radiculopathy, of having pain in the extremity." (Trial Tr. at 467:11-12.) Accordingly, Dr. Arnold referred Plaintiff to a neurosurgeon to determine the best course of treatment. (Trial Tr. at 471:4-14; Pl.'s Ex. 22; Pl.'s Ex. 23.)

44. On February 5th, Dr. Arnold noted that Plaintiff was still off duty due to a work-related condition and requested Plaintiff to return for a reevaluation on February 12, 2001. (Trial Tr. at 449:1-8; Pl.'s Ex. 19.)

45. On February 12th, Dr. Arnold noted that Plaintiff was still off duty due to a work-related condition and requested that Plaintiff follow up with his treating physician, Dr. Gonzales. (Trial Tr. at 451:20-24; Pl.'s Ex. 20.)

46. Finally, on a February 26th work status discharge sheet, Dr. Arnold discharged Plaintiff from his care. (Pl.'s Ex. 21.) Dr. Arnold was under the impression that Plaintiff would be working in an office setting. (Trial Tr. at 453:19-21.) Dr. Arnold indicated that Plaintiff could now perform sedentary work with limited use of his right upper extremity. (Trial Tr. at 452:19-453:2, 454:5-16; Pl.'s Ex. 21.) Dr. Arnold clarified that he meant that Plaintiff could work "a desk job," "sitting down and . . . doing things like minor office work." (Trial Tr. at 454:24-455:3.)

47. On subsequent work status discharge sheets from June 20, 2001, (Pl.'s Ex. 22), and July 9, 2001, (Pl.'s Ex. 23), Dr. Arnold similarly recommended that Plaintiff could perform "sedentary work as previously" with limited use of his right arm. Dr. Arnold testified that all the forms he filled out were sent to the Workers' Compensation division of the Committee on

Finance so the Committee could determine whether the visit "should be processed as a workers' compensation claim or denied." (Trial Tr. at 457:18-458:11.)

48. In 2001, Jack Drumgould was the assistant commissioner in charge of personnel in the Department. (Trial Tr. at 821:21-822:8.) Drumgould received Mercy Works work status discharge sheets for all six bureaus within the Department. (Trial Tr. at 823:14-23.) Drumgould testified that the standard procedure he followed when he received a discharge sheet was to contact a deputy or personnel liaison to meet with the duty-disabled employee to determine whether there existed a position within their bureau that could accommodate the employee. (Trial Tr. at 823:14-23.) Drumgould testified that after a bureau accepted an employee with his restrictions, Drumgould would send a copy of the Mercy Works discharge sheet to the Committee on Finance so it would remove the individual from duty disability or workers' compensation. (Trial Tr. at 824:23-825:1.) He would then send a copy to his staff so they could complete the paperwork necessary to restore the individual to the Department's payroll. (Trial Tr. at 825:1-4.)

49. Drumgould received Dr. Arnold's February 26, 2001 discharge sheet indicating that Plaintiff could perform sedentary work with certain restrictions. (Trial Tr. at 822:14-823:6.) Drumgould wrote on the sheet, "Cannot accommodate with restrictions" and signed and dated it on February 26, 2001. (Trial Tr. at 823:2-9; Pl.'s Ex. 89.) Drumgould stated that at that time, "there was no bureau or no position that could accommodate" Plaintiff's restrictions. (Trial Tr. at 823:12-13.) Drumgould also wrote on Plaintiff's discharge sheet, "CAN accommodate in Bureau of Traffic Services with restrictions as of 3-02-01." (Trial Tr. at 824:5-9; Pl.'s Ex. 89.)

## IV.    Plaintiff's Detail to the Bureau of Traffic Services

50.    Plaintiff returned to work and was "detailed" to the Bureau of Traffic Services ("Traffic Services"); a detail is a temporary assignment and means that Plaintiff was still being paid from the BOE's budget and still held the title of Chief Timekeeper, but was being utilized by a different bureau in the Department.  (Trial Tr. at 886:22-887:5.)  The expectation was that once Plaintiff was again able to perform the Chief Timekeeper duties, he would return to the BOE assuming that the function was still needed.  (Trial Tr. at 887:6-10.)

51.    It was not uncommon for employees in the City, and particularly in the Department, to perform duties outside the scope of their job title.  (Trial Tr. at 896:15-19.)  They held one official job title and were paid as though they were in that position, but they performed the tasks of a different title.  (Trial Tr. at 410:15-21.)  John Sullivan, the Managing Deputy Commissioner at the Department who oversaw all of the bureaus in the Department and supervised each bureau's deputy commissioner, (Trial Tr. at 697:4-15), testified that the Department of Personnel would need to be involved in order to change an official job description.  (Trial Tr. at 703:8-11.)  He testified, however, that the official job descriptions were "very old and outdated" and that "probably 50 percent of the people in the City work out of their job descriptions."  (Trial Tr. at 702:20-23.)

### A.    Plaintiff's assignment to Traffic Services

52.    Hennessey's predecessor as the labor relations liaison for the Department was William Bresnahan.  (Trial Tr. at 521:21-23.)  In 1998, Bresnahan became Deputy Commissioner of the Bureau of Traffic Services.  (Trial Tr. at 975:24-976:14.)

53.    In 2001, Bresnahan faced an issue in his duty as Deputy Commissioner of Traffic Services.  (Trial Tr. at 977:11.)  The City had hired an outside security company for the

automobile pound because some City employees had been assaulted and battered by individuals who came to pick up their cars. (Trial Tr. at 1020:16-22.) At the end of some of the security detail's shifts, there was "a discrepancy in the number of the cars that were supposed to be in the auto pound and the number of inventories" that were actually present. (Trial Tr. at 977:11-17.) Bresnahan believed "the security guards were letting cars go." (Trial Tr. at 977:18-19.) To combat the suspected theft, Bresnahan assigned several people to double check the receipts to ensure that the proper car was released to the proper individual. (Trial Tr. at 977:20-23.) He requested from the Department commissioner's office an employee that could be permanently assigned to that task. (Trial Tr. at 977:24-978:2.)

54. Bresnahan testified that someone from the commissioner's office—potentially Drumgould—called him to inform him that an employee who had some restrictions would be able to perform the function he requested. (Trial Tr. at 979:6-13.) Drumgould testified that he was not involved in the decision to assign Plaintiff to the auto pound and he did not discuss the decision with Bresnahan. (Trial Tr. at 825:21-826:9.) Sullivan testified that he was not involved in the decision to transfer Plaintiff to Traffic Services, but rather that Hennessey informed him that Plaintiff's transfer was "a deal she had worked out between the deputy commissioners in those two bureaus." (Trial Tr. at 701:6-17.) Murphy testified that he approved the transfer of Plaintiff to Traffic Services, but he did not make that decision. (Trial Tr. at 846:3-8.) Regardless of who made the decision to detail Plaintiff to Traffic Services, once he was there, Bresnahan made the decision to assign Plaintiff to the auto pound. (Trial Tr. at 1014:3-7.)

55. Bresnahan was aware of and actually signed the agreement that made accommodations for Plaintiff's medical restrictions in his Chief Timekeeper role. (Trial Tr. at 1010:8-23.) Bresnahan knew about Plaintiff's work restrictions when Plaintiff was assigned to

Traffic Services. (Trial Tr. at 979:14-980:1.) Specifically, Bresnahan received from Drumgould the Mercy Works discharge sheet from February 26th indicating that Plaintiff required sedentary work and limited use of his right arm, and on which Drumgould had written that Traffic Services could accommodate Plaintiff with restrictions as of March 2nd. (Trial Tr. at 980:16-19; Pl.'s Ex. 89.) Bresnahan considered the restrictions when he determined that Plaintiff would be assigned to double check the receipts. (Trial Tr. at 981:3-15.)

56.     On March 1, 2001, Plaintiff received a phone call requesting him to report to Room 701, the administrative offices of the Department, the following day. (Trial Tr. at 303:1-14.) Plaintiff reported to Room 701 on March 2nd and Jack Drumgould assigned him to Traffic Services. (Trial Tr. at 303:1-19.) Plaintiff then went to the administrative office of Traffic Services and told them who he was. (Trial Tr. at 304:11-14.)

57.     Bresnahan did not meet Plaintiff when he began working at Traffic Services, but he testified that the Chief Auto Pound Supervisor, John Rachmaciej, along with the supervisors of the auto pound, Joe Madison and Joe Perone, did meet Plaintiff. (Trial Tr. at 982:25-983:12.) Bresnahan instructed Rachmaciej to inform Plaintiff of his duties, and Bresnahan testified that Rachmaciej did. (Trial Tr. at 983:13-18.) Plaintiff recalled seeing Rachmaciej at Traffic Services on March 2nd, but he did not recall whether he talked to Rachmaciej that day. (Trial Tr. at 304:22-25.) He testified that he did not discuss his duties with anyone at the Traffic Services office. (Trial Tr. at 305:3-11.)

58.     Plaintiff testified that someone in a City uniform told him he was being assigned to the central auto pound, on lower Wacker Drive, and then led him there, the man in a City vehicle and Plaintiff in his car. (Trial Tr. at 305:16-306:7.) The man then led Plaintiff to a gate and told him that he would be stationed there. (Trial Tr. at 305:20-23.) The man pulled the gate

open, closed it, told Plaintiff "it's all greased up for you," and walked away. (Trial Tr. at 306:15-25.) Plaintiff understood this to mean that his job duty was to open and close the gate. (Trial Tr. at 306:12-307:4, 311:16-25.) Plaintiff also monitored the security guard to make sure he was not stealing cars. (Trial Tr. at 334:23-335:6.) The man did not identify himself or tell Plaintiff who his supervisors were, and Plaintiff did not ask. (Trial Tr. at 306:6-11.) Plaintiff did not ask anyone for clarification or tell anyone about his work restrictions. (Trial Tr. at 307:3-8.)

59.     Because of his injury, Plaintiff opened the gate with his left arm. (Trial Tr. at 310:21-25.) Plaintiff testified that he performed this duty for two weeks before his left arm "started going downhill," and he "had to just slowly stop doing it." (Trial Tr. at 334:17-19.)

60.     During the time he was opening and closing the gate, Plaintiff frequently used sick leave because his pain upon waking required him to take strong prescription painkillers, which precluded him from driving to work for "an hour or two" until some of the effect wore off. (Trial Tr. at 215:13-216:4.) Accordingly, Plaintiff requested that his 7:00 a.m. to 3:00 p.m. shift be changed to the later shift from noon to 8:00 p.m. (Trial Tr. at 342:18-22.) On March 25, 2002, Plaintiff received a memorandum from Denise Lanton, the Acting Director of Administration, regarding his use of sick time. (Def.'s Ex. 13; Trial Tr. at 339:13-18.) The memorandum stated that Plaintiff had been "consistently tardy" and had requested to apply his sick time to the time period he was tardy. (Def.'s Ex. 13.) The memorandum stated that "Auto Pound Supervisor Jorge Vargas requested that [Plaintiff] provide him with medical documentation of [Plaintiff's] illness on the dates [Plaintiff was] tardy in order to consider whether [Plaintiff's] tardiness qualifie[d] for sick leave," but that Plaintiff had failed to do so and his attendance record reflected "a pattern of unexcused excessive tardiness." (Def.'s Ex. 13.)

After Plaintiff received the March 25th memorandum, his shift change request was approved and he worked the noon-to-8:00 shift until he was laid off in July 2002. (Trial Tr. at 343:3-10.)

61.    Plaintiff had no supervisor, and the supervisors at the pound expressly told him that they were not his supervisors. (Trial Tr. at 307:7-23.) Bresnahan testified that when Plaintiff came to work at the auto pound in March, he had no job description; instead, his duties were verbally assigned to him, supposedly by Rachmaciej, when he began working in the position. (Trial Tr. at 1012:9-1013:2.)

**B.    Plaintiff's performance evaluations and pay raise denials**

62.    When an employee was entitled to a 5% pay raise that came with a step increase, his supervisor rated his performance on a salary advancement form. (Trial Tr. at 830:24-831:19.) Employees were rated as "excellent," "good," "fair," or "poor." (Trial Tr. at 831:9-11.) If an employee was rated "excellent" or "good," he received the pay increase; if he was rated "fair" or "poor," the increase was denied. (Trial Tr. at 831:11-14.) If employees were denied the merit pay increase, a written explanation of the reason for the denial was required. (Trial Tr. at 831:15-19.) Those forms were placed in the employee's personnel file in the Department's personnel division. (Trial Tr. at 831:20-832:1.)

63.    As Deputy Commissioner of the BOE, Murphy did not supervise Plaintiff once he was transferred to Traffic Services, nor did he check up on Plaintiff with Bresnahan while Plaintiff was working at Traffic Services. (Trial Tr. at 861: 13-19.) Nevertheless, in September 2001, when Plaintiff was detailed to Traffic Services, Drumgould sent Murphy a memorandum requesting Murphy's input on Plaintiff's salary advancement—whether or not Plaintiff should receive a merit pay increase. (Trial Tr. at 861:20-862:11.) Murphy recommended that Plaintiff's merit pay increase be denied. (Trial Tr. at 862:19-24.)

64.     On the review form, which Murphy signed on October 1, 2001, he checked the box for "unsatisfactory" rating, indicating that Plaintiff's performance was "so unacceptable that administrative action must be taken."  (Trial Tr. at 863:17-864:21.)  Murphy stated that the form was asking whether Plaintiff should receive a pay increase "based upon great work in his title of Chief Timekeeper; and he was performing no work in the title of Chief Timekeeper, so I couldn't give him a merit raise.  I just didn't feel that was right."  (Trial Tr. at 864:24-865:3.)  Murphy testified that when he evaluated his employees, he based it upon their current ability to perform their job duties, and Plaintiff was not performing the Chief Timekeeper job duties.  (Trial Tr. at 866:16-22.)  Murphy stated: "[Plaintiff] had said that he couldn't do those functions, so I don't know whether he had the ability or not; but I know he wasn't performing those functions."  (Trial Tr. at 867:25-868:2.)  Murphy testified that he thought "it would be unacceptable to give him more money for a job that he was not performing."  (Trial Tr. at 868:24-869:1.)

65.     Murphy testified that the "administrative action" the form refers to usually meant increased training or counseling to figure out why an employee was not performing at a "good" or "excellent" level and help him increase his proficiency.  (Trial Tr. at 869:12-24.)  Murphy did not talk to Plaintiff about his job performance or attempt to determine whether he needed additional training to do his job as Chief Timekeeper because Plaintiff was no longer working for the BOE.  (Trial Tr. at 869:25-870:4.)

66.     When a deputy commissioner gives an employee an "unsatisfactory" rating, he is asked to explain the reason.  (Trial Tr. at 870:15-18.)  Murphy wrote a memorandum explaining that since his appointment to the BOE in August 2000, Plaintiff had been of no value.  (Trial Tr. at 872:11-19.)  Murphy also stated: "[Plaintiff] cannot perform the functions of his title and has complained when given any other menial task to complete," which he clarified meant answering

the phones.  (Trial Tr. at 875:23-876:6.)  Murphy then stated that Plaintiff had been detailed to another bureau to try to accommodate him and that the BOE had not needed to replace him.  (Trial Tr. at 876:7-14.)  Murphy sent his memorandum to Al Sanchez, the Commissioner of the Department; Sullivan, the Managing Deputy Commissioner of the Department; Jack Kenney, the Deputy Commissioner of Administrative Services; and Hennessey, the Department's legal counsel.  (Trial Tr. at 870:15-871:6.)  He sent the rating only to Drumgould.  (Trial Tr. at 871:15-21.)  Murphy did not send the rating to Plaintiff because Plaintiff was no longer working for Murphy, nor did he send it to Bresnahan, Plaintiff's current supervisor.  (Trial Tr. at 871:19-10.)

67.    On December 20, 2001, Drumgould sent Bresnahan a memorandum informing him that Plaintiff was eligible for a merit pay increase on January 1, 2002, and requesting a rating of Plaintiff's performance as to whether Plaintiff deserved the increase.  (Trial Tr. at 992:1-6; Def.'s Ex. 9.)

68.    Bresnahan did not personally supervise Plaintiff's work.  (Trial Tr. at 987:14-16.)  As the Deputy Commissioner, however, Bresnahan made the final decision as to whether to award merit pay increases to employees in Traffic Services.  (Trial Tr. at 989:9-13.)  He based those decisions on recommendations by employees' supervisors, who had day-to-day contact with the employees.  (Trial Tr. at 989:14-15, 994:1-9.)

69.    On December 26, 2001, Rachmaciej, the Chief Auto Pound Supervisor, sent Bresnahan a memorandum about Plaintiff's salary advancement.  (Trial Tr. at 990:25-991:7; Def.'s Ex. 8.)  The memorandum recommended a rating of "marginal" for Plaintiff's performance of his duties and stated that he performed his duties "below an acceptable level do [sic] to excessive absenteeism."  (Trial Tr. at 990:4-7; Def.'s Ex. 8.)  The memorandum

concluded by recommending that Plaintiff's "salary advancement increase should be denied until his work attendance improves." (Def.'s Ex. 8.)

70.　　On December 28, 2001, Bresnahan returned Drumgould's December 20th memorandum indicating a "marginal" rating for Plaintiff, which resulted in the denial of Plaintiff's merit pay increase. (Trial Tr. at 993:16-25; Def.'s Ex. 9.) Bresnahan testified that he assumed the evaluation was intended to cover the time period from March 2001, when Plaintiff started working at Traffic Services, until the current date. (Trial Tr. at 993:8-15.) Bresnahan relied on Rachmaciej's December 26th memorandum when evaluating Plaintiff. (Trial Tr. at 994:11-14.)

71.　　When an individual was denied a merit pay increase, he was given another opportunity, approximately two months later, to receive the increase if he had improved upon the deficiency that prevented him from receiving it in the first place. (Trial Tr. at 995:16-996:1.)

72.　　On February 22, 2002, Bresnahan received another memorandum from Drumgould informing him that Plaintiff was eligible for a merit pay increase and requesting his rating. (Trial Tr. at 1006:14-22; Def.'s Ex. 10.)

73.　　Annette Phillips was an assistant general superintendent in Traffic Services. (Trial Tr. at 996:2-4.) Her responsibilities involved overseeing the administrative functions of the auto pound. (Trial Tr. at 997:11-16.) On February 25, 2002, she sent Bresnahan a memorandum about Plaintiff's salary advancement. (Trial Tr. at 1005:17-20; Def.'s Ex. 11.) It stated: "At this time a merit increase is not acceptable for [Plaintiff]. [Plaintiff] is assigned to the exit gate at Central Auto Pound for (4) four hours a day. [Plaintiff] has an attendance problem which needs improving." (Def.'s Ex. 11.)

74.     On February 23, 2002, Bresnahan returned Drumgould's February 22nd memorandum, again indicating a "marginal" rating for Plaintiff. (Trial Tr. at 1007:9-14; Def.'s Ex. 10.) Bresnahan testified that he relied on Phillips's February 25th memorandum when evaluating Plaintiff. (Trial Tr. at 1006:23-25.)

75.     On May 3, 2002, Bresnahan received another memorandum from Drumgould informing him that Plaintiff was eligible for a merit pay increase and requesting his rating. (Trial Tr. at 998:14-22; Def.'s Ex. 14.)

76.     On May 6, 2002, Phillips sent Bresnahan a memorandum about Plaintiff's salary advancement. (Trial Tr. at 996:7-11; Def.'s Ex. 15.) It stated: "[Plaintiff] still has not improved on his attendance, which is four (4) hours a day watching the gate at Central Auto pound . [sic] Based on these factor [sic] it is my recommendation that [Plaintiff] should not be given a increase [sic] in salary at this time..[sic]" (Def.'s Ex. 15.) From her memorandum, Bresnahan understood that Phillips was recommending that Plaintiff be denied a raise because of his attendance. (Trial Tr. at 996:25-997:5.)

77.     On May 6, 2002, Bresnahan returned the memorandum to Drumgould indicating a rating of "unsatisfactory," the lowest possible rating, for Plaintiff. (Trial Tr. at 999:3-11; Def.'s Ex. 14.) The reason Bresnahan gave Plaintiff an "unsatisfactory" ranking was because Plaintiff was given an opportunity to improve on his attendance issue and failed to do so. (Trial Tr. at 999:9-18.) Bresnahan relied on Phillips's memorandum to rate Plaintiff's performance. (Trial Tr. at 999:19-22.)

78.     None of these merit pay increase denials or negative performance evaluations were sent to Plaintiff. (Trial Tr. at 1025:6-8.) Plaintiff was assigned to Traffic Services from March 2, 2001, until July 2002, when his position was eliminated in the Reduction in Force, and

he did not receive any written performance evaluations during that time.  (Trial Tr. at 987:6-13, 988:2-5.)

79.     Bresnahan never had any discussions with Plaintiff about his attendance problems.  (Trial Tr. at 1003:1-3.)  Bresnahan did not know how frequently Plaintiff was absent, just that it was "enough to bring it to the attention of his supervisors."  (Trial Tr. at 1024:18-25.)  Plaintiff never approached Bresnahan to complain about any issues he was having at Traffic Services.  (Trial Tr. at 1003:4-7.)

**C.     Defendant's denial of treatment and of liability for Plaintiff's injury**

80.     On February 15, 2001, Mark Schechter from the City's Law Department wrote a memorandum to Serafin regarding Plaintiff's workers' compensation claim (the "Schechter Memo").  (Trial Tr. at 765:13-23; Pl.'s Ex. 55.)  It went into the Committee on Finance's workers' compensation file for Plaintiff.  (Trial Tr. at 766:2-4.)  The top of the Schechter Memo has handwriting next to the header.  (Pl.'s Ex. 55; Trial Tr. at 767:25-768:2.)  The handwriting appears to say "Phony."  (Pl.'s Ex. 55.)  Serafin testified that he did not write "phony" on the Memo and he did not know who did.  (Trial Tr. at 768:12-23.)  Murphy testified that he did not write "phony" on the Schechter Memo.  (Trial Tr. at 850:6-8.)  No viable explanation was offered by the Defendant as to how the word "phony" was written on Plaintiff's Exhibit 55.  The Court concludes that Plaintiff's Exhibit 55 strongly supports the jury's actual and advisory verdicts in this case.

81.     The Schechter Memo attached Plaintiff's medical records and stated: "Dr. Arnold indicated that [Plaintiff] is off duty due to a work-related condition."  (Pl.'s Ex. 55.)  The Memo further stated that Plaintiff's "attorney stated that [Plaintiff's] job duties recently changed, requiring repetitive use of his right hand, causing pain and swelling."  (Pl.'s Ex. 55.)  The

Schechter Memo also instructed Serafin to have Dr. Arnold reevaluate Plaintiff to see if he could perform phone answering duties with his left hand and consider whether the nerve block injections that Dr. Gonzales recommended on September 7, 2000, were appropriate. (Pl.'s Ex. 55; Trial Tr. at 774:25-775:9.) Finally, the Schechter Memo recommends that Plaintiff be placed on temporary disability from February 5th until Dr. Arnold released him to return to work. (Pl.'s Ex. 55; Trial Tr. at 776:4-12.)

82. The Schechter Memo was faxed to the BOE on March 2, 2001. (Trial Tr. at 777:17-779:9, 857:3-7; Pl.'s Ex. 56.) Serafin testified that he did not fax the Schechter Memo to the BOE and he did not know who did. (Trial Tr. at 779:11-15.)

83. On March 9, 2001, Drumgould sent a memorandum to Serafin stating that "as of Friday, March 2, 2001, [Plaintiff] has been accommodated within his restrictions and returned to work. [Plaintiff] has been assigned to the Bureau of Traffic Services." (Pl.'s Ex. 84.) Thus, Plaintiff was detailed to Traffic Services the same day the Schechter Memo was faxed to the BOE. (Trial Tr. at 859:6-20; Pl.'s Ex. 56; Pl.'s Ex. 84.)

84. Dr. Gonzales saw Plaintiff on March 15, 2001. (Trial Tr. at 134:20-135:8.) On March 15, 2001, Dr. Gonzales wrote another letter that he sent to the Committee on Finance and to Dr. Arnold. (Trial Tr. at 134:5-13.) The letter reiterated that Plaintiff's cervical radiculopathy was work-related and that Mercy Works (acting on behalf of the City) had recommended that he perform sedentary work with limited use of his right arm. (Trial Tr. at 134:22-135:1; Pl.'s Ex. 24.) The letter then stated: "His present work requires him to open & close the large gate at the police pound. This is significantly exacerbating his cervical radiculopathy and causing it to spread to his left upper limb. I strongly disagree with his present work duties." (Pl.'s Ex. 24.) Dr. Gonzales testified that "the delay in treatment and the lack of appropriate treatment was

making his condition worse." (Trial Tr. at 136:15-16.) Dr. Gonzales never received a response from the Committee on Finance. (Trial Tr. at 138:18-23.)

85.     Dr. Gonzales told Plaintiff not to open and close the gate on March 15th, but Plaintiff continued to do so, which exacerbated his arm injury. (Trial Tr. at 336:19-337:5.)

86.     On April 3, 2001, Dr. Gonzales sent another letter to the Committee on Finance. (Trial Tr. at 138:8-12.) It stated that Plaintiff was "getting worse as a result of ongoing aggravation of his work related cervical radiculopathy. Due to his deterioration I am recommending that he cease working at this time. He is to be re-evaluated in two weeks." (Pl.'s Ex. 25.) Dr. Gonzales never received a response from the Committee on Finance. (Trial Tr. at 138:18-23.)

87.     At some point, it came to Bresnahan's attention that Plaintiff was opening and closing the gate, and he told Rachmaciej "to put it in writing that [Plaintiff] was not to open and close the gate, that that was the security guard's job." (Trial Tr. at 984:2-8.) Bresnahan testified that, to the best of his knowledge, none of his supervising staff instructed any of the employees that Plaintiff was to open and close the gate. (Trial Tr. at 984:21-24.) On April 24, 2001, at Bresnahan's direction, Rachmaciej wrote a memorandum to Plaintiff informing him of his job assignment. (Trial Tr. at 985:7-20; Def.'s Ex. 6.)

88.     On April 24, 2001, Plaintiff received a memorandum from Rachmaciej clarifying his job assignment. (Trial Tr. at 335:12-18; Def.'s Ex. 6.) The memorandum instructs Plaintiff that his job duties include:

> To verify the vehicle identification number and or plates number of vehicles leaving the auto pound. 2) To help direct customers into the release trailer or to their vehicle after payment has been made[. ]As you were previously instructed Under [sic] no circumstances are you to open or close the gate.

(Def.'s Ex. 6.)  Plaintiff acknowledged in writing that he received the memorandum on April 24th and additionally wrote, "I was told not to open gate on or about March 15, 2001."  (*Id.*; Trial Tr. at 985:24-986:1.)  Plaintiff continued his detail at the auto pound and performed the duties outlined in the April 24th memorandum until he was laid off.  (Trial Tr. at 337:13-20.)

89.     Additionally on April 24th, Bresnahan wrote a memorandum to Serafin about Plaintiff's duties.  (Trial Tr. at 1015:24-1; Def.'s Ex. 7.)  The memorandum says:

> Be advised that [Plaintiff] was specifically instructed ***not*** to open and close the gate at Central Auto Pound.  [Plaintiff] is to check the paper work that the guard checks to insure the proper vehicle is leaving the auto pound.  NO city employee is to open or close the gate.  On several occasions in the past week I was at Central Auto Pound and observed the security guard open and close the gate.  [Plaintiff] did not touch the gate and is never suppose [sic] to touch the gate.

(Def.'s Ex. 7.)  Bresnahan testified that he sent the memorandum as a result of someone, he could not remember who, asking him to make sure that Plaintiff was acting within his job restrictions.  (Trial Tr. at 1017:15-20.)

90.     On May 14, 2001, Dr. Gonzales wrote another letter stating that Plaintiff was still under his care "for treatment of his work-related injury" and outlining the treatments he needed.  (Trial Tr. at 141:15-24; Pl.'s Ex. 26.)  This note was stamped as received by Traffic Services on May 18, 2001.  (Trial Tr. at 1022:12-22, 1023:8-19; Pl.'s Ex. 91.)  Accordingly, someone in Traffic Services was aware on May 18th that Plaintiff was under the care of a doctor for a work-related injury.  (Trial Tr. at 1023:21-1024:4.)  Dr. Gonzales never received a response from the Committee on Finance.  (Trial Tr. at 138:18-23.)

91.     On August 1, 2001, Dr. Gonzales sent a note to the Committee on Finance and Dr. Arnold stating that Plaintiff remained in Dr. Gonzales's care and needed physical therapy.  (Trial Tr. at 143:2-10; Pl.'s Ex. 27.)  Dr. Gonzales never received a response from the Committee on Finance.  (Trial Tr. at 138:18-23.)

92.     On February 20, 2002, Dr. Gonzales sent a note to the Committee on Finance stating that Plaintiff had to miss a half a day of work due to the severity of his pain from his radiculopathy and the sedating effects of the pain medication Dr. Gonzales had prescribed. (Trial Tr. at 143:21-144:5; Pl.'s Ex. 28.)  Dr. Gonzales also sent to the Committee on Finance an order for physical therapy for Plaintiff's radiculopathy, three times a week for four weeks.  (Trial Tr. at 144:11-23; Pl.'s Ex. 29.)  Dr. Gonzales never received a response from the Committee on Finance.  (Trial Tr. at 138:18-23.)

93.     On July 17, 2002, Plaintiff had a visit at Dr. Gonzales's office.  (Trial Tr. at 145:16-17.)  Dr. Gonzales testified that Plaintiff's condition was worsening because he was not receiving needed medical care.  (Trial Tr. at 147:14-19.)  Dr. Gonzales noted that Plaintiff continued to experience weakness and severe pain in his right arm, which were made worse by activity.  (Pl.'s Ex. 30.)  Dr. Gonzales noted additional atrophy, discoloration, and swelling of his right arm and hand.  (*Id.*)  Dr. Gonzales indicated that the City had "refused to authorize payment for [Plaintiff's] medical care related to his work injury" and that Plaintiff would contact him when there was "some indication that his employer [will] pay for treatment."  (Pl.'s Ex. 30.)

94.     On July 17, 2002, Dr. Gonzales sent another note to the Committee on Finance verifying that Plaintiff was still under his care and still needed medical treatment.  (Trial Tr. at 148:17-24; Pl.'s Ex. 31.)  He sent a similar note on November 22, 2002.  (Trial Tr. at 154:20-155:3; Pl.'s Ex. 47.)  Dr. Gonzales never received a response from the Committee on Finance. (Trial Tr. at 138:18-23.)

95.     On September 4, 2002, Dr. Gonzales found that Plaintiff's condition was worsening.  (Trial Tr. at 152:22-24.)  That prompted him to write a detailed summary of Plaintiff's condition and the treatment and diagnostic testing he needed.  (Trial Tr. at 150:14-24;

Pl.'s Ex. 45.)  The letter concluded:  "Plaintiff's condition is permanent, but I expect that treatment will benefit him.  I also expect that treatment will result in some functional improvement.  At present, and until there is some therapeutic success, he remains totally disabled from gainful employment.  His incapacity for work is directly the result of the work related injury in question."  (Pl.'s Ex. 45.)

96.     On December 23, 2002, Dr. Gonzales again ordered an MRI of Plaintiff's cervical spine.  (Trial Tr. at 155:9-14; Pl.'s Ex. 48.)

97.     Plaintiff never received a blue card.  (Trial Tr. at 93:16-25, 729:6-9.)  His workers' compensation file included no First Report of Injury.  (Trial Tr. at 730:4-9, 795:3-7.)  Plaintiff's personnel file did include notice that he filed a claim with the Illinois Industrial Commission on September 1, 2000.  (Trial Tr. at 732:1-5.)  It also included Dr. Gonzales's letter from September 7, 2000.  (Trial Tr. at 732:25-734:2; Pl.'s Ex. 80.)  Upon the receipt of these two documents, Committee on Finance procedures instruct that the Committee has three options: to begin to pay disability payment, to provide a written explanation for its refusal to pay disability, or to conduct an investigation into the underlying occurrence.  (Trial Tr. at 738:12-739:2.)

98.     Serafin and the Committee on Finance continued to deny that Plaintiff's injury was work-related until after Plaintiff was terminated.  (Trial Tr. at 781:6-783:7.)

99.     The nerve block injections were never authorized, nor were any of the treatments Dr. Gonzales requested.  (Trial Tr. at 777:5-16.)  In fact, no medical treatment was ever authorized for Plaintiff.  (Trial Tr. at 752:8-16.)

### V.     The 2002 Reduction in Force

100.     In July 2002, a citywide reduction in force ("RIF") occurred because the revenues were "falling significantly short" of what had been projected and budgeted for 2002.  (Trial Tr. at 684:21-22, 685:5-8.)

101.     On July 1, 2002, Plaintiff received a letter from Commissioner Sanchez advising him that he was "being placed on paid administrative leave until further notice."  (Pl.'s Ex. 34; Trial Tr. at 209:7-13.)  He also received a packet notifying him that his position was terminated as part of the RIF and that as of July 31, 2002, he would be laid off.  (Def.'s Ex. 21; Trial Tr. at 216:21-217:9.)

102.     From 1989 through 2010, Peter Peso worked in the City's Office of Budget and Management (the "OBM"), and he was appointed to the position of Manager of Compensation Control in 1993.  (Trial Tr. at 484:20-24, 493:25-494:5.)  In that role, he was responsible for making sure that City employees were paid according to their salaries and contracts and managing filled and vacant positions.  (Trial Tr. at 485:1-8.)

103.     Peso managed a spreadsheet of positions that were eliminated during the 2002 RIF.  (Trial Tr. at 486:3-10; Def.'s Ex. 26.)  The spreadsheet was populated from RIF documents the various departments submitted to the OBM.  (Trial Tr. at 486:14-22.)

104.     Peso testified that approximately 50 positions in the Department were eliminated in the RIF, (Trial Tr. at 489:4-7), but Drumgould testified that testified that approximately 200 employees from the Department were terminated in the 2002 RIF, (Trial Tr. at 828:15-19).  It is clear, however, that the Department eliminated all of its timekeeping positions in the 2002 RIF.  (Trial Tr. at 498:21-25.)  Fifteen supervising timekeeping positions and one Chief Timekeeper position were eliminated from the Department.  (Trial Tr. at 498:12-20; Def.'s Ex. 26.)

105.    After departments' proposed layoffs were approved by the budget director, the forms were sent to the Department of Personnel to determine who would be subject to layoff. (Trial Tr. at 494:22-495:14.)  This determination involved examining the titles, bargaining units, and seniority for the employees on the list, as well as the various contracts and City personnel rules.  (Trial Tr. at 495:16-22.)  "Bumping rights" were typically part of a contract or City personnel rules.  (Trial Tr. at 495:23-25.)  When a position is eliminated, if the person in that position is more senior than other employees in the department, she can avoid a layoff by exercising a right to "bump" the more junior employee out of his position.  (Trial Tr. at 496:1-9.)

106.    During the relevant time period, Russell Carlson was the First Deputy Budget Director in the OBM.  (Trial Tr. at 684:6-12.)  His duties in that position involved formulating or supervising the formulation of the City's budget each year and monitoring the City's expenditures and revenues.  (Trial Tr. at 684:13-17.)  Carlson testified that the positions that were eliminated in the 2002 RIF were supposed to remain unfilled at least through 2003.  (Trial Tr. at 685:14-19.)  Carlson testified that 300 to 400 or more positions were eliminated citywide in the 2002 RIF.  (Trial Tr. at 694:20-24.)  The OBM determined targeted dollar amounts each department needed to cut, and the department heads were free to decide what criteria to use in selecting positions to eliminate.  (Trial Tr. at 685:20-686:9.)  Peso was in charge of keeping track of the lists of positions the department heads decided to cut.  (Trial Tr. at 686:10-14.)

107.    At the time, John Sullivan was the Managing Deputy Commissioner of the Department and he was the Department's contact on its RIF form.  (Trial Tr. at 688:1-4; Pl.'s Ex. 97.)  On June 19, 2002, Carlson sent Sullivan a memorandum with an attached spreadsheet explaining the OBM's determination of the number of positions the Department would need to lay off.  (Trial Tr. at 688:5-689:22; Pl.'s Ex. 13.)

108.     The OBM's review of the lists the department heads sent back of positions they intended to cut was primarily mathematical, to make sure they met the dollar amount they were requested to meet, and to ensure that the departments were not eliminating vital positions.  (Trial Tr. at 693:8-20.)

109.     Sullivan testified: "The budget office gave the department a set dollar amount of personnel savings that they had to achieve during that budget season.  Each bureau within the department was then passed along their budget ceiling with the amount of cuts they had to come up with.  Each bureau, which is run by a deputy commissioner, submitted to the commissioner's office a list of people that they proposed to be included in the layoff.  Those lists were reviewed with the commissioner, probably Jack Kenney who was the Deputy Commissioner of Administrative Services, and the bureau, the deputies of the bureaus, and ultimately a final list was submitted to the Office of Budget and Management."  (Trial Tr. at 704:8-19.)  Sullivan testified that he was involved in the Department's determination of what positions to eliminate, but Commissioner Sanchez had the final say on the list that the Department submitted to the OBM.  (Trial Tr. at 704:20-23.)

110.     Jack Kenney was the Deputy Commissioner of the Bureau of Administration, which is within the Department of Streets and Sanitation.  (Trial Tr. at 895:15-19, 897:8-14.)  As the Deputy Commissioner, Kenney was responsible for the entire Bureau of Administration, which included the Personnel, Contacts, Payroll, and Finance divisions.  (Trial Tr. at 897:22-24.)  One of his duties was to prepare and submit the budget to the OBM for approval.  (Trial Tr. at 898:6-11.)

### A. The transition to Kronos

111.	In January 2000, the Department converted to electronic timekeeping through the Kronos system. (Trial Tr. at 634:10-15.)

112.	In January 2001, Gualberto Lopez became the Coordinator of Special Projects for the City. (Trial Tr. at 657:5-14.) In that position, he oversaw payroll for the Department. (Trial Tr. at 657:16-20.) Lopez testified that when Kronos became widely implemented, the City no longer had a need for supervising timekeepers. (Trial Tr. at 679:3-680:2.) Lopez testified that there were currently no supervising timekeepers within the Department, and that after the July 2002 RIF, there were no chief timekeepers employed in the Department or, to his knowledge, in the City. (Trial Tr. at 681:23-682:14.)

113.	Up until and through most of 2001, supervising timekeepers were assigned to the various bureaus within the Department. (Trial Tr. at 901:1-7.) In late 2001, the Department began to centralize its timekeeping and payroll functions so that all the supervising timekeepers worked for the Department as a whole rather than for individual bureaus. (Trial Tr. at 901:10-14.)

114.	When the Department began to use Kronos, it was done haphazardly and was not effective as the Department's sole timekeeping system. (Trial Tr. at 903:1-9.) In March or February of 2002, there was a push within the Department to fully implement and utilize Kronos to its full timekeeping capacity. (Trial Tr. at 903:21-904:2.) Instead of having supervising timekeepers collect the manually filled out timesheets and enter them and any edits into the payroll ledger, the timesheets were going to be done in Kronos and automatically submitted to the payroll, with employees' individual supervisors submitting any necessary edits. (Trial Tr. at 902:12-19, 904:10-15.) Thus, the supervising timekeepers were moved to a centralized location.

(Trial Tr. at 904:16-20.)  The Department was one of the three pilot departments to fully implement Kronos and "totally eliminate manual payroll."  (Trial Tr. at 905:16-906:2.)

115.     Kenney testified that the comptroller suggested that the full implementation of Kronos would eliminate the need for the timekeeping function and, because "the discussion of a reduction in force was already on the table," recommended that the Department eliminate the timekeeping positions as one piece of its RIF.  (Trial Tr. at 910:4-8.)  Kenney thus recommended to Sullivan that all of the timekeeping positions, including the chief timekeeper position, be eliminated in the RIF.  (Trial Tr. at 910:18-911:3, 912:12-17.)  Commissioner Sanchez approved that recommendation.  (Trial Tr. at 911:4-6.)

116.     Kenney testified that because of Kronos, all the job titles that fell within the timekeeping function were eliminated, regardless of what the duties were at the time.  (Trial Tr. at 913:2-7.)  After the RIF, there were no chief or supervising timekeeping positions remaining in the Department.  (Trial Tr. at 913:14-21.)

117.     Some employees who held the title of supervising timekeeper were transferred immediately prior to the RIF.  (Trial Tr. at 829:2-5.)

118.     By July 2002, the Department had fully implemented Kronos.  (Trial Tr. at 911:7-12.)  Any remaining timekeepers were preparing and entering edits, a task which was to be reassigned to the on-site supervisors.  (Trial Tr. at 911:7-19.)

119.     After Kronos was implemented, there was still a need for oversight of the payroll function.  (Trial Tr. at 915:4-7.)  That responsibility fell to field payroll auditors—supervisors in the field who made sure the time of the employees they supervised was entered properly.  (Trial Tr. at 915:17-24.)  Kenney testified, however, that all of the functions for timekeeping were necessary at least until the end of 2002.  (Trial Tr. at 918:10-14.)

120.    At some point, Stevens returned to the BOE to perform the timekeeping and payroll tasks that had been assigned to Plaintiff.  (Trial Tr. at 650:20-25.)  However, since he performed the supervising timekeeper tasks under the job title of laborer, his position was not eliminated in the 2002 RIF.  (Trial Tr. at 653:1-12.)

121.    From 1999 until at least 2004, the Department had an employee, whose official title was Assistant Commissioner, who was in charge of payroll and timekeeping.  (Trial Tr. at 830:11-17.)

122.    Murphy prepared a list of positions he thought could be eliminated from the BOE without negatively impacting the bureau.  (Trial Tr. at 877:14-16, 878:22-879:2.)  He included the chief timekeeping position because no one had been performing it and the BOE had not been negatively impacted.  (Trial Tr. at 878:19-879:17.)  Additionally, the BOE had no supervising timekeepers since Plaintiff's transfer.  (Trial Tr. at 884:7-11.)  The Department was transitioning to Kronos, which reduced the number of timekeeping positions that were necessary, and was centralizing the remaining timekeeping functions as a Department timekeeping unit rather than multiple bureau timekeeping units.  (Trial Tr. at 883:19-23.)  Murphy did not make the final decision as to the Department's RIF list, however.  (Trial Tr. at 881:24-882:2.)

123.    Bresnahan was not involved in the decision to include Plaintiff in the July 2002 RIF.  (Trial Tr. at 1003:19-25.)  Plaintiff's position as Chief Timekeeper was not in Traffic Services' budget, and Bresnahan did not know Plaintiff's position was going to be eliminated until the day of the RIF.  (Trial Tr. at 1004:1-11.)

## VI.    Plaintiff's Pension Loss

124.    Professor Larry DeBrock testified as an expert witness.  He was an economics professor and the dean of the college of business at the University of Illinois.  (Trial Tr. at

357:16-18, 358:22-24.) Professor DeBrock performed an analysis of Plaintiff's pension loss. (Trial Tr. at 359:20-22.) He considered life expectancy and the schedule of Plaintiff's monthly benefits from the pension board, along with a projection of Plaintiff's future earnings if he had kept working. (Trial Tr. at 361:14-362:22, 363:15-364:6.) He did not consider Plaintiff's health condition or specific life expectancy, only the statistical average life expectancy for a man Plaintiff's age. (Trial Tr. at 378:1-13.) He did not review the Illinois Pension Code to determine if he was calculating the pension in accordance with the applicable laws. (Trial Tr. at 374:11-14.)

125.    Professor DeBrock testified that if Plaintiff had retired on his fiftieth birthday, the present value of his lost pension benefits would be approximately $1.3 million. (Trial Tr. at 366:8-15.) If Plaintiff retired on his fifty-fifth birthday, the present value of his lost pension benefits would be around $1.2 million. (Trial Tr. at 366:16-19.)

126.    Professor DeBrock relied on Plaintiff's continuous service date—February 11, 1974, when Plaintiff began working for the City—to make his calculations. (Trial Tr. at 376:1-8.) He testified that he relied on that date because that was the date listed on the report the pension fund prepared for Plaintiff. (Trial Tr. at 376:23-25.) He also assumed that Plaintiff would continue to work after his July 31, 2002 termination. (Trial Tr. at 379:17-24.)

127.    DeBrock testified that if Plaintiff had withdrawn money from his pension, that would change DeBrock's pension loss calculations. (Trial Tr. at 377:7-10.)

128.    Jane Tessaro also testified about Plaintiff's pension loss. Tessaro was the manager of the benefits department at the Municipal Employees Annuity and Benefit Fund of Chicago, the pension fund for some City workers. (Trial Tr. at 1041:6-21.) Because the municipal pension fund is different from the Chicago Park District pension fund, Plaintiff did not

start contributing to the municipal pension fund until December 1981. (Trial Tr. at 1042:5-14.) Thus, when Plaintiff was terminated, he had 21 years of pension credit in the fund, which would have enabled him to start collecting benefits at age 55. (Trial Tr. at 1043:10-16.) To collect a pension at 50, an employee needed to have at least 30 years of service credit. (Trial Tr. at 1043:20-23.)

129.    In September 2005, Plaintiff withdrew all of his contributions in the pension fund—$87,192.95. (Trial Tr. at 1044:1-4.) He testified that he needed the money to pay bills after he was terminated. (Trial Tr. at 220:2-7.) Once an employee receives a refund of his pension contributions, he forfeits all future benefits from the pension fund. (Trial Tr. at 1044:5-9.)

130.    A City employee's continuous service date is used for purposes of salary, advancement, and vacation; it does not indicate when an employee began contributing to the pension. (Trial Tr. at 1045:1-9.)

131.    Tessaro testified that any calculation of benefits that did not take the Pension Code into consideration would not be correct because the Pension Code describes "the formula to use in calculating a benefit, what types of benefits are pensionable, how to calculate service credit, how to calculate final average salary." (Trial Tr. at 1046:8-16.)

132.    Tessaro testified that, given Plaintiff's termination on July 31, 2002, if Plaintiff had not withdrawn money from his account, he would have received $2,091.00 a month beginning at age 55. (Trial Tr. at 1046:17-23.) If he had not been terminated and had instead continued to work at his same salary until age 55, he would have received a pension of $3,507 per month beginning at age 55. (Trial Tr. at 1046:24-1047:5.)

# CONCLUSIONS OF LAW

## I. Legal Standards

1. The ADA prohibits an employer from retaliating against an employee for requesting an accommodation. 42 U.S.C. § 1220(a).

2. The jury's verdict that Defendant did not discriminate against Plaintiff under the ADA does not foreclose Plaintiff's ADA retaliation claim. "The Act prohibits an employer from retaliating against an employee who has raised an ADA claim, whether or not that employee ultimately succeeds on the merits of that claim." *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007) (citing *Cassimy v. Bd. of Educ. of Rockford Pub. Schs.*, 461 F.3d 932, 938 (7th Cir. 2006)). Rather, "it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry" in determining whether an employer retaliated based on an employee's protected actions under the ADA. *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1096 (7th Cir. 1998) (quoting *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1182 (7th Cir. 1982)).

3. The retaliation provisions of the "principal federal employment discrimination statutes are materially identical." *Twisdale v. Snow*, 325 F.3d 950, 952 (7th Cir. 2003) (citing Title VII, 42 U.S.C. § 2000e-3(a); the Age Discrimination in Employment Act, 29 U.S.C. § 623(d); the Rehabilitation Act, 29 U.S.C. § 794(d); and the ADA, 42 U.S.C. § 12203(a)). Therefore, the framework for the analysis of retaliation claims is the same under these statutes. *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 758 n.16 (7th Cir. 2006). "[C]ourts look to Title VII retaliation cases for guidance in deciding retaliation cases under the ADA." *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009).

**II.    Whether the City Retaliated Against Plaintiff in Violation of the ADA**

4.      Plaintiff argues that Defendant retaliated against him because he requested ADA accommodations by denying his pay increases and terminating him.  (R. 125, Third Am. Compl. ¶ 68.)  Plaintiff seeks damages for the pay denials and the lost pension benefits.  (*Id.* at 15.)  To succeed on his retaliation claim, Plaintiff must prove by a preponderance of the evidence that he requested an accommodation, and that his request was the but-for cause of his pay increase denials or his termination.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).

5.      Plaintiff engaged in a protected activity under the ADA when he requested accommodations for his injury.  "[A]n informal complaint may constitute protected activity for purposes of retaliation claims."  *Casna*, 574 F.3d at 427.  Plaintiff repeatedly complained to his supervisors that he was having problems performing his newly assigned tasks due to his injury.  (Trial Tr. at 61:23-62:12, 250:8-10, 636:14-24.)  Additionally, Plaintiff's counsel sent Defendant a letter requesting accommodations.  (Pl.'s Ex. 49.)  Finally, Dr. Arnold, Dr. Fischer, and Dr. Gonzales repeatedly informed Defendant that Plaintiff required an accommodation—namely, limited use of his right arm.  (Pl.'s Ex. 21, 22, 23, 24, 42, 78.)  These communications should have conveyed to Defendant that Plaintiff required accommodation under the ADA.  *See Casna*, 574 F.3d at 427; *Alexander v. Gerhardt Enters., Inc.*, 40 F.3d 187, 195 (7th Cir. 1994). Accordingly, Plaintiff has proved by a preponderance of the evidence that he engaged in a protected activity under the ADA.

6.      Plaintiff's pay increase denials were materially adverse employment actions. Defendant urges this Court to conclude that the merit pay increases Plaintiff was eligible for were bonuses to which Plaintiff was not entitled, and thus that the denials of the increases did not

constitute adverse employment actions. (R. 521, Def.'s Proposed Findings at 8.) The denial of a raise qualifies as an adverse employment action, but the denial of a bonus does not. *Farrell v. Butler Univ.*, 421 F.3d 609, 614 (7th Cir. 2005) (citing *Hunt v. City of Markham*, 219 F.3d 649, 654 (7th Cir. 2000); *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1006 (7th Cir. 2000)). The Seventh Circuit has distinguished between the two: "Bonuses generally are sporadic, irregular, unpredictable, and wholly discretionary on the part of the employer. Raises are the norm for workers who perform satisfactorily." *Hunt*, 219 F.3d at 654. "[T]he denial of a bonus is inherently ambiguous, as well as less damaging to the employee because he didn't count (or at least should not have counted) on it," while "[t]he denial of a raise is more likely to reflect invidious motivation." *Id.*

7. The evidence in the record establishes that the merit pay increases Plaintiff was denied were more akin to raises than to bonuses. Murphy referred to a merit pay increase as "a salary advancement" and "a merit raise." (Trial Tr. at 862:4, 865:2.) Bresnahan referred to it as "a merit salary increase." (Trial Tr. at 992:3.) Salary advancement opportunities came up routinely for some employees, every two to three years. (Trial Tr. at 862:15-18, 988:16-20.) Although a supervisor was not required to give an eligible employee a merit pay increase, (Trial Tr. at 888:13-16), a written explanation was required for a denial, (Trial Tr. at 632:24-633:2). Bresnahan testified that a merit pay increase was a pay raise that an employee was entitled to if he deserved it. (Trial Tr. at 988:6-11.) He differentiated between a cost-of-living increase and a merit pay increase. (Trial Tr. at 989:5-8.) Finally, the merit pay increases were not one-time rewards for good service; rather, they were permanent salary increases. (Trial Tr. at 993:1-7.) Accordingly, the Court concludes that the merit pay increases were raises rather than bonuses, and thus the denials of merit pay increases constituted materially adverse employment actions.

8.      It is undisputed that Plaintiff's termination constituted a materially adverse employment action.  *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009). Thus the only issue in dispute is whether Plaintiff's requests for accommodation were the but-for cause of his pay increase denials or his termination.

9.      Plaintiffs in retaliation cases rarely have a direct admission by their employers of retaliatory motive, so causation is typically established through "a convincing mosaic of circumstantial evidence that would support the inference that a retaliatory animus was at work." *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1180 (7th Cir. 2013) (internal citations and quotation marks omitted) (quoting *Smith v. Bray*, 681 F.3d 888, 901 (7th Cir. 2012)).  The types of circumstantial evidence that are frequently used include "suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn," as well as "evidence that the employer offered a pretextual reason for an adverse employment action."  *Id.* (internal citations and quotation marks omitted) (quoting *Bray*, 681 F.3d at 901).

10.     Plaintiff argues that the "suspiciously short period of time" between Plaintiff's July 1, 2000 pay increase denial and his notifying his superiors that he needed accommodation provides the causal link between the two.  (R. 528, Pl.'s Proposed Findings & Conclusions at 29.)  However, Plaintiff testified that he did not tell Vittori that he needed accommodation until August 8th.  (Trial Tr. at 262:5-9.)  In late June, Plaintiff did alert Heffernan and Donlan that he was having problems performing the duties Vittori assigned, (Trial Tr. at 61:23-62:12, 250:8-10), but he did not request an accommodation, (Trial Tr. at 251:12-18).  Plaintiff testified that he had a good relationship with Donlan and Donlan had no animus towards him.  (Trial Tr. at 254:12-20.)  The Court finds no evidence in the trial record that indicates that Plaintiff requested an

accommodation before his July 1, 2000 pay increase denial, or that Donlan informed anyone about Plaintiff's statement that he was struggling with his new duties. Plaintiff contends that Defendant's failure to produce any documentation to justify the pay denial "is compelling evidence that the City denied these pay increases in retaliation for Plaintiff exercising his rights under the ADA," but Plaintiff has failed to prove that at the time of the first denial, Plaintiff *had* exercised his rights under the ADA. The Court thus cannot conclude that Plaintiff's July 1, 2000 pay increase denial was caused by his request for accommodation.

11.     Plaintiff fails to provide the Court any reasoning on which it might base a conclusion that any of the subsequent pay denials were retaliatory. In fact, the Court finds that the subsequent pay denials were also unrelated to Plaintiff's requests for accommodation. Instead, they were based upon the City's confusing practice of detailing employees to various positions in other divisions within their department but maintaining their same official assignments. That practice led to Plaintiff's performance while he was detailed to Traffic Services being evaluated by Brian Murphy, the Deputy Commissioner of the BOE, because Plaintiff was identified within the Department as a Chief Timekeeper in the BOE. On October 1, 2001, Murphy indicated that Plaintiff's performance as a Chief Timekeeper was not worthy of a pay increase—because Plaintiff was in fact not acting as Chief Timekeeper at the time. (Trial Tr. at 863-869.) The Court finds that Murphy's evaluation, while perhaps unfair, was not a pretext for retaliation, and the subsequent denial of a raise was not motivated by the City's desire to retaliate against Plaintiff for requesting accommodation.

12.     Plaintiff's January 1, 2002 pay denial was based on an evaluation by the Chief Auto Pound Supervisor, Rachmaciej. That evaluation recommended that Plaintiff's raise be denied "until his work attendance improve[d]" because of his "excessive absenteeism." (Trial

Tr. at 990-991; Def.'s Ex. 8.) Similarly, Plaintiff's February 2002 and May 2002 pay denials were based on his attendance. (Trial Tr. at 996-999, 1005-1007; Def.'s Exs. 11, 15.) Plaintiff failed to offer any evidence by which the Court might infer that those denials were pretextual, nor does he refute that he was frequently tardy or absent. Thus, Plaintiff's pay increase denials based on his absenteeism do not indicate retaliation against his request for accommodation. *See, e.g.*, *Squibb*, 497 F.3d at 787 ("[the employer's] act of disciplining Ms. Squibb for multiple absences in this position also does not provide any evidence that it harbored a retaliatory motive"). The Court concludes that Plaintiff's requests for accommodation were not the but-for cause of his pay increase denials.

13.     Plaintiff further contends that his change in job duties evinces retaliatory intent, and that Hennessy authorized the changes in Plaintiff's job duties after discovering that he needed accommodations. (R. 528, Pl.'s Proposed Findings & Conclusions at 30.) In fact, the evidence in the record shows that Plaintiff's job duties changed in May of 2000 when Vittori became Plaintiff's supervisor. (Trial Tr. at 58:4-59:6, 243:17-244:17.) Plaintiff had never performed all the duties of the Chief Timekeeper. When Plaintiff's injury became more prohibitive than it had been, Hennessy requested a written description of the Chief Timekeeper duties so she could determine how best to accommodate him.

14.     Finally, Plaintiff provides no reason for this Court to find that he was terminated in retaliation for his request for accommodation. In fact, Plaintiff was terminated more than a year after he was accommodated in Traffic Services. Plaintiff fails to point to any requests for accommodation he made, other than the request to work the late shift rather than the early shift, after his transfer to Traffic Services. The Court finds no nexus between his termination and his requests for accommodations under the ADA.

15.     Thus, the Court adopts the jury's advisory determination that Plaintiff failed to satisfy his burden to prove by a preponderance of the evidence that his requests for accommodations were the but-for cause of either his termination or his pay-increase denials. This outcome is not inconsistent with the jury's verdict for Plaintiff on his state law retaliatory discharge claim.  The jury was instructed that to succeed on his ADA retaliation claim, Plaintiff must "prove by a preponderance of the evidence that Defendant terminated him and/or denied him merit pay increases because he requested an accommodation."  (R. 498, Jury Instructions at 27.)  The instruction for Plaintiff's Illinois Workers' Compensation Act claim stated that to prove retaliatory discharge, Plaintiff had to prove that he "was terminated because he requested medical treatment for his work related injury and/or because he filed a Worker's Compensation Claim with the Illinois Industrial Commission;" that he sustained damages as a result of his termination; and that his request for medical treatment and/or filing of a Worker's Compensation Claim was a proximate cause of his termination and the resulting damages.  (R. 498, Jury Instructions at 30.)  The difference between Plaintiff's ADA retaliation claim and his state law retaliatory discharge claim is the protected right.  A claim under either requires proof of exercise of a protected right.  42 U.S.C. § 12203(a) (it is unlawful to discriminate against an individual who has exercised a right protected by the ADA); *Groark v. Thorleif Larsen & Son, Inc.*, 596 N.E.2d 78, 81 (Ill. App. Ct. 1st Dist. 1992) (a state law retaliatory discharge claim requires "the plaintiff's exercise of a right granted by the Workers' Compensation Act").

16.     The jury clearly determined that Defendant terminated Plaintiff in retaliation for requesting medical treatment and/or filing a workers' compensation claim, not for requesting an accommodation.  Simply put, the objective timeline analysis does not support a finding that Plaintiff's multiple accommodation requests, which Defendant attempted to comply with, were

the source of Defendant's animus toward Plaintiff. On the other hand, as the jury properly concluded, the overwhelming trial testimony and documentary evidence supports a finding that Plaintiff was targeted for retaliatory treatment after September of 2000 because Defendant reached the unfounded conclusion that Plaintiff's medical treatment requests and workers' compensation claim were fraudulent or "phony." Plaintiff's multiple ADA accommodation requests prior to September of 2000 did not result in illegal retaliation. On the other hand, after Plaintiff's workers' compensation claim was filed in September 2000, there was an immediate retaliation by Defendant which resulted in the transfer of Plaintiff to a series of adverse job assignments and the inevitable causal dismissal of Plaintiff. The jury properly concluded that Plaintiff's treatment and Defendant's attempted accommodation of Plaintiff prior to September 2000 shows a lack of discriminatory animus under the ADA.

17. Because Plaintiff failed to prove by a preponderance of the evidence that his requests for accommodation under the ADA provided the but-for cause of his termination or his pay raise denials, the Court finds for Defendant on Plaintiff's claim of retaliation in violation of the ADA.

## PLAINTIFF'S MOTION TO VACATE

Plaintiff moves the Court to vacate a portion of the Court's April 19, 2013 Order that granted judgment in favor of Defendant on his ADA retaliation claim "without disturbing any other portion of the Judgment and entry of the Order." (R. 503, Pl.'s Mot. Vacate.) Plaintiff reminds the Court that the parties and the Court agreed that his ADA retaliation claim was submitted to the jury on an advisory basis only. (*Id.* ¶ 2.) Plaintiff sought to submit to the Court additional evidence on the ADA retaliation claim that was not submitted to the jury. (*Id.* ¶ 4.) The Court denied this request on June 5, 2013, and entered and continued the remainder of the

motion until the Court ruled on the remaining post-trial motions. (R. 526, Min. Entry.) For the reasons stated above in its Findings of Fact and Conclusions of Law, the Court now DENIES Plaintiff's motion to vacate the advisory jury verdict on the ADA retaliation claim.

## DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

At the close of evidence, Defendant moved for judgment as a matter of law on each of Plaintiff's claims. (R. 490, Def.'s Mot. J.) The Court denied the motion without prejudice to its renewal after the jury verdict. (R. 494, Min. Entry; Trial Tr. at 1155:13-1156:6.) On May 15, 2013, pursuant to Federal Rule of Civil Procedure 50(b), Defendant filed its renewed motion for judgment on Plaintiff's state law retaliatory discharge claim. (R. 508, Def.'s Renewed Mot. J.)

Rule 50 authorizes a court to enter judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). Under this standard, "the question is simply whether the evidence as a whole, when combined with all reasonable inferences permissibly drawn from that evidence, is sufficient to allow a reasonable jury to find in favor" of Defendant. *Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008) (citing *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2007)). In making this determination, the Court may not reweigh the evidence, draw its own inferences, or substitute its own determinations regarding the credibility of the witnesses for those made by the jury. *Gower v. Vercler*, 377 F.3d 661, 666 (7th Cir. 2004). Instead, the Court should "reverse the verdict only if no rational jury could have found for the prevailing party." *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 835 (7th Cir. 2013) (citing *Bogan v. City of Chi.*, 644 F.3d 563, 572 (7th Cir. 2011)).

"To state a cause of action for retaliatory discharge, plaintiffs must show that: (1) they were employees of defendants before or at the time of the injury; (2) they exercised some right

granted by the Act; and (3) their discharge was causally related to the exercise of their rights under the Act." *Grabs v. Safeway, Inc.*, 917 N.E.2d 122, 126 (Ill. App. Ct. 1st Dist. 2009) (internal citations omitted) (citing 820 Ill. Comp. Stat. 305/1 *et seq.*; *Clark v. Owens-Brockway Glass Container, Inc.*, 697 N.E.2d 743, 746 (Ill. App. Ct. 5th Dist. 1998)). It is undisputed that Plaintiff was employed by Defendant before he was terminated and that he exercised rights protected by the IWCA by filing a workers' compensation claim. Defendant argues, however, that Plaintiff failed to establish the third element of his retaliatory discharge claim—that his discharge was causally related to the exercise of his rights under the IWCA. (R. 510, Def.'s Mem. J. at 3.) Specifically, Defendant argues that Plaintiff failed to prove that Commissioner Sanchez, who made the final decisions as to the RIF, knew that Plaintiff had exercised his rights under the IWCA, (*id.* at 4-8), and that the Chief Timekeeper position would not have been eliminated but for Plaintiff's statutorily protected activities, (*id.* at 8-13). Consequently, Defendant argues that the jury's verdict in Plaintiff's favor on his retaliatory discharge claim is unsupported by the evidence presented at trial and requests judgment as a matter of law. (*Id.* at 13-14.)

Both of the reasons Defendant provides as to why the Court should grant it judgment as a matter of law are flawed. First, Plaintiff was not required to expressly demonstrate that the RIF decision-maker knew about Plaintiff's workers' compensation claim and requests for medical treatment in order for the jury to conclude that Plaintiff was discharged in retaliation of those protected activities. *See, e.g.*, *Gomez v. The Finishing Co.*, 861 N.E.2d 189, 198 (Ill. App. Ct. 1st Dist. 2006) (even though plaintiff had no direct evidence of pretext, a reasonable jury could have concluded that defendant's reason for terminating plaintiff was pretextual and found that plaintiff's discharge was retaliatory). The jury only had to find that it was more likely than not

that Plaintiff's workers' compensation claim and requests for medical treatment were causally related to his termination. *See Grabs*, 917 N.E.2d at 126. The evidence presented at trial, taken as a whole, supports the conclusion that Plaintiff began to experience adverse consequences as soon as he filed his workers' compensation claim, in retaliation of that claim, culminating in his termination.

In addition, Defendant's assertion that Plaintiff had to prove that his protected activities under the IWCA were the but-for cause of his termination is incorrect. To succeed on his state law retaliatory discharge claim, Plaintiff was required to show that his workers' compensation claim and requests for medical treatment were the *proximate* cause of his termination. *See Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 408 (Ill. 1998) ("Cases brought for retaliatory discharge based on an employee's filing of a workers' compensation claim should be reviewed using traditional tort analysis."). The jury was informed of this standard and was given a modified version of the Illinois Pattern Jury Instruction for retaliatory discharge. *See* Ill. Pattern Jury Instr.-Civ. 250.01. The jury was also properly instructed that the "proximate cause" of Plaintiff's termination "need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury." (R. 498, Jury Instructions at 29); Ill. Pattern Jury Instr.-Civ. 15.01. Defendant's argument that the implementation of Kronos and the City-wide RIF were the reasons for Plaintiff's termination thus fails to convince the Court that no reasonable jury could have concluded that Plaintiff's workers' compensation claim and requests for medical treatment were proximate causes of his termination.

On January 24, 2001, despite having been informed by Dr. Gonzales that Plaintiff's injury was work-related, (Pl.'s Ex. 39), the Committee on Finance sent Plaintiff a letter denying liability for his worker's compensation claim. (Pl.'s Ex. 16). The Committee on Finance

continued to refuse to authorize payment for any medical treatment or acknowledge that Plaintiff's injury was work-related, despite being informed by Dr. Arnold that the condition was work-related, (Pl.'s Ex. 20), and receiving multiple requests for follow-up treatment by both Dr. Arnold and Dr. Gonzales, (*see, e.g.*, Pl.'s Exs. 21, 22, 23, 26, 30, 39, 45). The Law Department also informed the Committee on Finance that Plaintiff had a work-related injury and that he needed to be placed on duty disability and accommodated when Dr. Arnold released him to return to work. (Pl.'s Ex. 55, Schechter Mem.) The Law Department also recommended that Dr. Arnold reevaluate Plaintiff to consider whether the treatment Dr. Gonzales recommended was appropriate. (*Id.*) Plaintiff never received that treatment, though, and someone wrote the word "phony" on the top of the Schechter Memo before it was faxed to the BOE, suggesting that the Committee on Finance believed that Plaintiff's workers' compensation claim was fraudulent. (Pl.'s Exs. 55, 56.) The evidence outlined above persuasively demonstrates Defendant's retaliatory animus towards Plaintiff.

The Court also finds evidence by which a rational jury could have concluded that this retaliatory animus was a factor in Plaintiff's termination. An analysis of the timeline in this case demonstrates a series of progressively worse work assignments that began immediately after Plaintiff requested medical treatment and filed a worker's compensation claim. Despite Dr. Fischer's assessment that Plaintiff was qualified to perform the Chief Timekeeping functions with the same restriction he had been accommodated with for years—limited use of his right hand and arm, (Pl.'s Ex. 42)—the City effectively demoted Plaintiff once he filed a workers' compensation claim. Hennessey testified that Plaintiff was not demoted because he still had the same job title and received the same salary, although the Court notes that the job title was later cited as the reason for Plaintiff's termination. The evidence presented at trial indicates that the

transfer was a demotion: Plaintiff went from a supervisory position in which he was responsible for overseeing the payroll operations of the BOE to a position in which he checked receipts as people left the auto pound.

On September 1, 2000, the day Plaintiff filed his workers' compensation claim, he was transferred to the Construction Division to answer phones. (Trial Tr. at 89:1-8, 272:13-18.) A month later, he was transferred to the garage of the Transportation Division to answer phones. (Trial Tr. at 91:8-93:8, 290:20-22.) Hennessey testified that she authorized those transfers and she had no idea that Plaintiff had filed a worker's compensation claim. (Trial Tr. at 592:5-25.) Donlan testified, however, that he called Hennessey on August 24, 2000, a week before Plaintiff was transferred to the Construction Division, to request a blue card authorizing medical treatment for Plaintiff. (Trial Tr. at 287:9-288:6.) The Court observes that Hennessey was antagonistic on the stand, and the Court finds it plausible that the jury significantly discounted her testimony. The Court defers to credibility determinations the jury had to make to resolve witnesses' conflicting testimony. *Gower*, 377 F.3d at 666.

On December 18, 2000, Dr. Gonzales sent the City a note stating that Plaintiff was impaired by a work-related injury and requesting that Plaintiff refrain from working due to that injury. (Pl.'s Ex. 43.) On December 21st, Hennessey sent Plaintiff a letter referencing Dr. Gonzales's note. (Def.'s Ex. 2.) The letter did not advise Plaintiff to apply for disability or authorize him to seek medical treatment for his injury; it advised him to apply for a leave of absence. (*Id.*) When Donlan delivered the letter to Plaintiff, Donlan told him not to report back to work. (Trial Tr. at 297:22-23.) Finally, after the Law Department wrote the Schechter Memo informing the Committee on Finance that Plaintiff should be placed on disability, (Pl.'s Ex. 55), Plaintiff was reinstated and put to work checking receipts at the auto pound, where he worked

outside year-round, (Trial Tr. at 212:25-213:11.).  Plaintiff's assignment to the auto pound

happened the same day the Schechter Memo with the word "phony" written across it was faxed

to the BOE.  (Pl.'s Ex. 56.)  This timeline evinces Defendant's retaliatory animus that kept

Plaintiff in increasingly undesirable positions, kept Plaintiff in the dark about his multiple

negative performance reviews and pay denials, and ultimately led to him being terminated in the

RIF because of a job title that did not match his duties.

Defendant argues that Plaintiff's position was eliminated as a cost-cutting measure

because the City no longer needed timekeepers.  (R. 510, Def.'s Mem. J. at 9-11.)  "[I]f an

employer chooses to come forward with a valid, nonpretextual basis for discharging its

employees and the trier of fact believes it, the causation element required to be proven is not

met."  *Clemons*, 704 N.E.2d at 406 (citing *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 730 (Ill.

1992)).  Nevertheless, an employer that presents "an arguably valid basis for firing an employee,

. . . may still be liable for retaliatory discharge if the actual motivation for the termination was

the employee's pursuit of a workers' compensation claim."  *Brooks v. Pactiv Corp.*, 729 F.3d

758, 768 (7th Cir. 2013) (citing *Siekierka v. United Steel Deck, Inc.*, 868 N.E.2d 374, 380 (Ill.

App. Ct. 3d Dist. 2007)).  Here, Defendant put forth a basis for Plaintiff's discharge, the City-

wide RIF, and it is clear that the jury found that basis to be pretextual.  This conclusion does not

signify that the jury determined that Defendant did not actually need to lay off employees in

order to maintain fiscal stability.  Rather, the evidence presented at trial painted a clear picture

that the filing of Plaintiff's workers' compensation claim and his continued requests for medical

treatment led to a series of increasingly undesirable work assignments and pay raise denials.  The

Department employed individuals to supervise and edit payroll and timekeeping in the Kronos

system until at least 2004, (Trial Tr. at 830:11-17), undermining Defendant's contention that

Kronos rendered all timekeeping positions obsolete. Additionally, timekeepers other than Plaintiff were transferred to positions that did not have the timekeeper title in advance of the RIF. (Trial Tr. at 829:2-5.) Thus, the evidence at trial proved that despite the Department's continuing need for the very timekeeping tasks Plaintiff had been performing and despite the fact that Defendant could have transferred Plaintiff to a different title that would not have been eliminated, Plaintiff was terminated. The jury was entitled to find that his termination was motivated by a retaliatory animus driven by Defendant's belief that Plaintiff's workers' compensation claim and requests for medical treatment were "phony." The Court concludes that a rational jury could have found for Plaintiff on his state law retaliatory discharge claim. *See AutoZone*, 707 F.3d at 835. Accordingly, the Court DENIES Defendant's renewed motion for judgment as a matter of law.

## DEFENDANT'S MOTION FOR A NEW TRIAL OR, ALTERNATIVELY, TO REINSTATE THE ORIGINAL JURY VERDICT

Defendant next moves pursuant to Federal Rule of Civil Procedure 59 for a new trial or, alternatively, to reinstate the jury verdict from the first trial. (R. 511, Def.'s Mot. New Trial.) Rule 59 allows a court to order a new trial if "the verdict is against the clear weight of the evidence or the trial was unfair to the moving party." *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (quoting *David v. Caterpillar, Inc.*, 324 F.3d 851, 863 (7th Cir. 2003)). In ruling on such a motion, a court "may consider the credibility of witnesses, the weight of the evidence, and anything else which justice requires." *Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788, 798 (7th Cir. 1989). The trial court must afford some deference to the jury's conclusions. *Mejia v. Cook Cnty., Ill.*, 650 F.3d 631, 633 n.1 (7th Cir. 2011*).* "A court will set aside a verdict as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict." *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012) (internal alterations omitted)

(quoting *Marcus & Millichap Inv. Servs. of Chi. v. Sekulovski*, 639 F.3d 301, 313 (7th Cir. 2011)); *see also Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995) (A new trial should be granted "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the Court's] conscience.").

Defendant argues that it was deprived of a fair retrial for a number of reasons: (1) Plaintiff violated *in limine* rulings; (2) the Schechter Memo should have been excluded or remained redacted; (3) Plaintiff's expert witness should have been barred from testifying about Plaintiff's alleged lost pension benefits; (4) Plaintiff did not properly impeach Defendant's witnesses; (5) testimony regarding allegedly falsified personnel documents should have been excluded; and (6) the Court's statement about certain memoranda Plaintiff had drafted "potentially confused the issues and biased the jury."  (R. 511, Def.'s Mot. New Trial ¶¶ 10-16.) The Court addresses each argument in turn.

## I.    Violations of *in Limine* Rulings

Defendant first argues that Plaintiff violated the Court's *in limine* rulings while the City complied with the rulings, thus giving Plaintiff an unfair advantage that warrants a new trial.  (R. 524, Def.'s Mem. New Trial at 2.)  As a preliminary matter, the Court notes that it clearly stated during the pretrial conference that its *in limine* rulings were conditional and subject to reexamination in the context of the trial.  (R. 497, Mar. 18 Tr. at 39:4-7 ("[I]f you want to revisit that at trial, you're free to do that.  All the rulings that I'm making right now are all conditional rulings subject to being revisited in the context of the trial.").)  At trial, the Court did in fact adjust some of its *in limine* rulings, which is within the Court's discretion.  *Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558, 565 (7th Cir. 2006).  Defendant's argument that Plaintiff's violation of certain *in limine* rulings justifies a new trial strikes the Court as a

backdoor attempt to seek reconsideration of those rulings. Nevertheless, the Court examines each of Plaintiff's alleged *in limine* violations to determine if they provide grounds for a new trial.

### A.  Evidence about Plaintiff's 1987 and 1992 injuries

Defendant contends that the Court granted Plaintiff's motion *in limine* number 8 to exclude any evidence regarding his 1987 and 1992 work-related injuries but allowed Plaintiff to testify about those injuries and the resultant 1995 legal settlement. (R. 524, Def.'s Mem. New Trial at 3-4.) In addition, Defendant contends that Plaintiff objected to its attempts to cross-examine witnesses on the same subjects and those objections were sustained. (*Id.*) Defendant argues that this double standard "undoubtedly confused the jury and prevented the jury from hearing evidence that oppugned the credibility of Plaintiff" and Dr. Gonzales. (*Id.* at 4.)

Defendant mischaracterizes Plaintiff's motion *in limine* number 8. Plaintiff's motion *in limine* number 8, which the Court granted, sought to exclude evidence regarding Plaintiff's 1987 and 1992 work-related injuries, related workers' compensation claims, and the legal settlement of those workers' compensation claims. (R. 395, Pl.'s Mots. *in Lim.* at 89.) It did *not* seek to bar reference to Plaintiff's alleged disability, which is a substantial focus of this litigation, or Defendant's 1995 Agreement to accommodate the resulting medical restrictions. (*Id.*) The Court notes that the 1995 Agreement is different than any *legal* settlement of Plaintiff's claims, to which motion *in limine* number 8 applied. Plaintiff's counsel walked the fine line between refraining from referring to Plaintiff's prior work-related injuries so as not to relitigate those issues and providing the necessary context for the 1995 Agreement. For example, in the first section of the transcript Defendant complains about, Plaintiff said no more than was necessary to provide context for the accommodated position he held:

> Q: Okay. And what -- what happened in 1995 that caused you to have a change in position in the bureau?
> A: Oh, the City made an agreement that I would be made the Chief Timekeeper.
> Q: Okay. Before that agreement, was -- did you have any physical problem that arose?
> A: Yes. My arm had swollen up and there, you know -- and it was from doing a lot of repetitive use things.
> Q: Okay. And in that time, about 1995, you and the City of Chicago agreed that you would become Chief Timekeeper instead, right?
> A: Correct.

(Trial Tr. at 39:9-20.) Plaintiff did not mention anything about his workers' compensation claims or testify that his injury was work-related. If Plaintiff had not set out this scant background information, the jury would have been confused as to why Plaintiff had an agreement with the City, why he was not performing all the tasks of a Chief Timekeeper, and why the addition of duties in the summer of 2000 would have been so surprising and detrimental. (*See also* Trial Tr. at 52:17-23, 79:21-80:7.) Similarly, Dr. Gonzales's testimony describing Plaintiff's medical condition and accompanying restrictions was directly relevant to the issues at trial, and Defendant's objections to that testimony are similarly meritless.

Defendant's argument that it was subject to a double standard is disingenuous. For the most part, Defendant did not raise any objections to testimony about these matters at trial. When Defendant did object, the Court ordered Plaintiff to rephrase the question. (Trial Tr. at 63:16-24.) Defendant was able to elicit testimony about Plaintiff's prior injuries and the 1995 Agreement to the same extent Plaintiff was. (*See, e.g.*, Trial Tr. at 222:10-18.) Defendant was not, however, allowed to elicit testimony about any legal settlement regarding Plaintiff's prior injuries or testimony that Plaintiff's prior injuries were work-related, which would have violated the *in limine* ruling. (*See* Trial Tr. at 224:25-225:6, 259:1-7.) Additionally, Hennessy—Defendant's witness—seemed to attempt to refer to "the settlement agreement" and prior litigation as much as possible, to which Defendant did not object. (*See, e.g.*, Trial Tr. at 530:4-6,

537:9-18, 538:6-10, 539:4-8, 540:24-541:5, 542:9, 553:19-23, 554:2-5, 564:10-11, 564:15, 564:18, 564:21-23, 566:24-25, 568:14-16, 568:24-569:2.)  Finally, the Court had to instruct Hennessy not to mention the legal settlement and instruct the jury to disregard any mention to the 1995 settlement agreement.  (Trial Tr. at 569:16-22.)

Defendant urges the Court to find duplicitous Plaintiff's contention that because his references to injuries did not refer to the work-related nature of his injuries, they complied with the *in limine* ruling.  Plaintiff's motion *in limine* number 8 states, in relevant part:

> This Court should bar the City from presenting evidence or testimony regarding the 1987 & 1992 work related injuries and the settlement of those claims because it is undisputed they were work related . . .  The City admits that it was accommodating the Plaintiff for his disability as a result of these injuries from 1995 through 2000.  The fact of prior workman's compensation injuries, claims and disposition is irrelevant to the issues in this case which relate to the Defendant's conduct in the years 2000-2002.

(R. 395, Pl.'s Mots. *in Lim.* at 89.)  The Court does not find Plaintiff's characterization of this motion *in limine* duplicitous or deceitful.  The clear intent of this motion *in limine* was to exclude evidence related to prior workers' compensation claims and work-related injuries in order to keep the jury focused on the relevant time period.  The Court's rulings at trial served this purpose by excluding references to the work-related nature of the prior injuries while allowing basic background information the jury needed.  Any violation Defendant perceived does not warrant a new trial.

**B.      Evidence about Plaintiff's workers' compensation claim**

Next, Defendant argues that Plaintiff misled and confused the jury by "intentionally conflating medical insurance and duty disability benefits and . . . suggesting that he was denied medical treatment" in contravention of the Court's ruling on Defendant's motion *in limine* number 2 to exclude evidence of and references to the previously dismissed Workers'

Compensation Act claim and any alleged denial of medical treatment. (R. 524, Def.'s Mem. New Trial at 5-6.) The Court granted Defendant's motion *in limine* number 2 in part, but denied it in part. Specifically, the Court ruled that evidence pertaining only to Plaintiff's unsuccessful retaliatory denial of medical treatment claim would be excluded but that evidence pertaining to elements of Plaintiff's remaining retaliation claim would be allowed. (R. 497, Mar. 18 Tr. at 14:6-23.) The Court indicated that it would rule on individual documents in context if necessary and stated: "I don't want to relitigate the WCA claim because that could confuse the jury, but I understand that the retaliation claim would allow for certain documents to be admitted." (*Id.* at 14:19-16:8.)

Defendant raises only one instance when it objected to Plaintiff's alleged relitigation[1]: when Plaintiff's counsel asked Serafin whether, as of September 17, 2002, he denied that Plaintiff's injury was work-related. (Trial Tr. at 782:16-25.) Defendant argues that Judge Andersen's holding that Illinois does not recognize a cause of action for retaliation under the IWCA short of retaliatory discharge means that evidence that Defendant denied liability and denied Plaintiff's requests for medical treatment for a work-related injury are not evidence of Defendant's retaliatory intent. This argument is baseless. "[A]n employee exercises a right under the IWCA merely by requesting and seeking medical attention." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th Cir. 2012); *see also Hinthorn v. Roland's of Bloomington, Inc.*, 519 N.E.2d 909, 913 (Ill. 1988). Evidence that Defendant interfered with Plaintiff's rights under the WCA is certainly relevant to the jury's determination as to whether Defendant later retaliated against the exercise of those rights. *See Michael v. Precision Alliance Grp., LLC*, 2014

---

[1] Defendant raises several instances in which it objected to Plaintiff's line of questioning, but these objections were based on relevance and lack of foundation, (Trial Tr. 118:17-21, 139:17-22, 146:2-7), and leading questions, (*id.* at 718:21-719:2), not on an alleged relitigation of Plaintiff's WCA claims or a violation of an *in limine* ruling.

IL App (5th) 120517-U (Ill. App. Ct. 5th Dist. Jan. 21, 2014) (indirect evidence properly admitted to prove retaliatory discharge); *Gomez*, 861 N.E.2d at 198 (same). Additionally, much of the evidence Defendant complains about was relevant to Plaintiff's ADA failure to accommodate claim.

The Court expressly stated in the pretrial conference that the line between what related to Plaintiff's unsuccessful retaliation claim and his remaining retaliation claim would be nuanced. (R. 497, Mar. 18 Tr. at 14:19-15:10.) Accordingly, the Court ruled on documents and testimony in the context of the trial. Upon review of the trial record as a whole, the Court does not find any support for Defendant's claim that the jury's verdict is based on emotions and prejudices rather than facts. The Court does concur with Defendant that the jury award, pursuant to the jury instructions, included compensation for lost pension benefits. The proper response to the excessive award is not a third trial, but rather a remittitur. The Court addresses Defendant's motion for remittitur below.

### C. References to defense counsel

Finally, Defendant objects to Plaintiff's violation of the Court's grant of Defendant's motion *in limine* number 10 to prevent Plaintiff from referring to counsel as, *inter alia*, "the City" or "the Law Department." (R. 524, Def.'s Mem. New Trial at 9.) Defendant argues that "Plaintiff was permitted, over the City's objections, to refer to defense counsel as attorneys from the City's Law Department." (R. 524, Def.'s Mem. New Trial at 9 (citing Trial Tr. at 532:7-15)). Defendant contends that Plaintiff's fleeting reference to "the City's Law Department" "implied to the jury that defense counsel were part of the elaborate conspiracy that Plaintiff concocted in an effort to find some tenuous support for his retaliatory discharge claim." (*Id.*)

In fact, Plaintiff referenced "attorneys from the Law Department," Defendant objected, and the Court ordered Plaintiff to rephrase the question. (Trial Tr. at 532:7-10.) Plaintiff did refer to "the City of Chicago" in its rebuttal, but most of those references were to the City itself and not to defense counsel personally. (Trial Tr. at 1161:15-25.) Plaintiff's single rebuttal reference to defense counsel as "the City," (Trial Tr. at 1160:25-1161:5), was not in strict accord with the Court's *in limine* ruling, but the Court finds that it did not have a prejudicial impact on the jury. Defendant cannot honestly expect the Court to believe that two improper references to defense counsel as "the City" over the course of a seven-day trial, one of which Plaintiff was instructed to rephrase, were prejudicial. The Court thus finds no basis to conclude that any alleged violations of the Court's *in limine* rulings provide grounds for a new trial.

## II. Evidentiary Rulings

Defendant also seeks a new trial based on certain evidentiary rulings. (R. 511, Def.'s Mot. New Trial ¶¶ 12, 13, 15.) A party seeking a new trial based on erroneous evidentiary rulings bears a "heavy burden." *Alverio v. Sam's Warehouse Club*, 253 F.3d 933, 942 (7th Cir. 2001). Even if an evidentiary ruling is erroneous, a new trial is warranted "only if the error had a substantial influence over the jury, and the result reached was inconsistent with substantial justice." *E.E.O.C. v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012) (quoting *Farfaras*, 433 F.3d at 564).

## A. The Schechter Memo

Defendant argues that the Schechter Memo, (Exs. 55, 56), should have been excluded. (R. 524, Def.'s Mem. New Trial at 10.) Defendant argued this point unsuccessfully in a motion *in limine*. (R. 404, Def.'s Mot. *In Lim.* No. 8; R. 497, Mar. 18 Tr. at 33:6-8 (denying the motion).) Defendant also objected at trial to the introduction of the Schechter Memo into

evidence, and the Court overruled that objection.  (Trial Tr. at 763:21-764:15.)  The Court ruled

that the Schechter Memo was admissible and relevant to Plaintiff's claims of retaliatory

discharge and discrimination.  (R. 497, Mar. 18 Tr. at 33:6-15; Trial Tr. at 764:2-15.)  Defendant

has presented no reason for the Court to conclude that its two previous rulings on this point were

erroneous, and the Court declines to rehash that analysis for a third time.

Defendant additionally argues that even if the Schechter Memo was properly allowed,

only the redacted version should have been allowed pursuant to a ruling by Magistrate Judge

Valdez and because the document was protected by attorney-client privilege.  (R. 524, Def.'s

Mem. New Trial at 10.)  This position was argued in Chambers at a pretrial conference on March

18, 2013, and this Court declined to vacate Judge Valdez's finding that the Memo had been

widely distributed throughout the City such that Defendant had waived its ability to claim

privilege.  (R. 497, Mar. 18 Tr. at 38:18-39:3.)  Defendant contends that the Court erroneously

allowed Plaintiff to rescind a January 2006 stipulation to use the redacted Memo.  (R. 524, Def.'s

Mem. New Trial at 10-11.)  In support, Defendant cites *Graefenhain v. Pabst Brewing Co.*, in

which the Seventh Circuit held that "the district court has 'broad discretion' to decide whether to

hold a party to its stipulations."  870 F.2d 1198, 1206 (7th Cir. 1989).  At the March 18th pretrial

conference, the Court found that the waiver of privilege supported the use of the unredacted

Memo and held that Defendant's arguments as to the unknown writer of the word "Phony" and

Serafin's denials were pertinent to the weight of the evidence, not to its admissibility.  (R. 497,

Mar. 18 Tr. at 33:9-17, 38:19-39:3.)  The admission of this evidence was also proper because,

though prejudicial to the City, its probative value was not substantially outweighed by the danger

of *unfair* prejudice.  Fed. R. Evid. 403.  Defendant has presented no reason to find that the

admission of the unredacted Schechter Memo was erroneous.

### B.     DeBrock's testimony

Defendant next argues that DeBrock should have been barred from testifying for the reasons it set forth in its motion *in limine* and motion to reconsider.  (R. 524, Def.'s Mem. New Trial at 13.)  Defendant argues that DeBrock's testimony was irrelevant because Plaintiff could not recover lost wages and was not entitled to lost pension benefits; that his testimony was prejudicial because it misled the jury; and that his calculations were not the product of reliable principles and methods.  (*Id.* at 13-14.)  Defendant made these same arguments in its motion *in limine*, (R. 457, Def.'s Mot. *in Lim.* No. 6), which the Court denied in the pretrial conference, (R. 497, Mar. 18 Tr. at 47:12-24), and in its motion to reconsider that ruling, (R. 485, Def.'s Mot. Reconsider re Def.'s Mot. *in Lim*. No. 6), which the Court also denied, (R. 488, Min. Entry).  As the Court stated in the pretrial conference, DeBrock had sufficient expertise as an economist to testify as to lost pension benefits, and Defendant's cross-examination of him was sufficient to expose any inaccuracies in his calculations.  (R. 497, Mar. 18 Tr. at 47:17-24.)  To the extent that the jury "heard calculations that were both inflated and incorrect," as Defendant claims, (R. 524, Def.'s Mem. New Trial at 14), it also heard Defendant's rigorous cross-examination of DeBrock as well as contradictory testimony from Defendant's own pension expert, Jane Tessaro.  Because DeBrock satisfied the *Daubert* standards and presented testimony that was relevant to Plaintiff's damages, the Court finds no error its refusal to bar him from testifying.

### C.     Allegedly falsified employment documents

Defendant argues that Plaintiff's question to Drumgould as to whether he was "aware that documents were falsified to justify employment decisions in the Department between the years of 1998 until [he] retired in 2004" had no probative value because Plaintiff did not present any evidence that the Department had falsified any personnel document related to him.  (R. 524,

Def.'s Mem. New Trial at 15-16.)  Defendant similarly argued that such testimony would be

irrelevant and prejudicial in its motion *in limine* number 1, (R. 398, Def.'s Mot. *in Lim.* No. 1),

which the Court denied in part, specifically to allow this information to come in, because the

Court determined that testimony that employment documents had been falsified could be

particularly relevant to Plaintiff's retaliatory discharge claims, (R. 497, Mar. 18 Tr. at 13:11-

14:5).  Defendant cites no legal support for its conclusory argument that this probative evidence

should have been excluded.  The Court still finds such testimony relevant, and Defendant's

argument that such testimony was "prejudicial to the City," (R. 537, Def.'s Reply New Trial at

27), does not signify that the testimony should have been excluded.  *See* Fed. R. Evid. 403

(permitting the exclusion of evidence that is *unfairly* prejudicial).

The Court thus finds that its evidentiary rulings as to the Schechter Memo, DeBrock's

testimony, and Drumgould's testimony on falsified employment documents were not erroneous.

Additionally, even if the Court's evidentiary rulings were erroneous, the Court does not find that

the jury's verdict "was inconsistent with substantial justice," and thus the evidentiary rulings

provide no basis upon which a new trial may be granted.  *See Mgmt. Hospitality of Racine*, 666

F.3d at 440.

## III.  Improper Impeachment

Defendant argues that Plaintiff failed to properly impeach any of its witnesses and instead

read portions of their prior testimony into the record even though that testimony "was not

inconsistent, was not impeaching, and/or was flagrantly mischaracterized."  (R. 524, Def.'s

Mem. New Trial at 14-15.)  Defendant contends that this tactic was improper and prejudiced the

jury against the City and its witnesses.  (*Id.* at 15.)  Some of the examples Defendant cites were,

in fact, proper impeachment—Plaintiff illustrated that the witness had given a contrary answer

on a prior occasion when under oath.  (*See, e.g.*, Trial Tr. at 543:24-545:24, 555:7-556:24, 625:12-627:1, 766:9-767:20, 867:13-869:1.)  Other times, Plaintiff's impeachment efforts fell short.  (*Id.* at 574:9-575:10, 735:23-738:6, 741:20-743:16, 864:12-865:20.)  Defendant fails, however, to provide any legal support for its argument that improper impeachment is justification for a new trial, (R. 524, Def.'s Mem. New Trial at 14-15), or any factual support for its spurious claim that "Plaintiff secured a victory through gamesmanship rather than evidence," (R. 537, Def.'s Reply New Trial at 26).  The Court finds no support for either of these arguments.

The examples of improper impeachment Defendant cites were not calculated attempts at "subterfuge to get before the jury evidence not otherwise admissible."  *Taylor v. Nat'l R.R. Passenger Corp.*, 920 F.2d 1372, 1376 (7th Cir. 1990) (quoting *United States v. Webster*, 734 F.2d 1191, 1192 (7th Cir. 1984)).  They were simply failed attempts to undermine the credibility of Defendant's witnesses.  Defendant provides no reason for the Court to find that these inefficiencies prejudiced the jury against it except for Plaintiff's argument in closing that certain witnesses were "impeached over and over."  (R. 524, Def.'s Mem. New Trial at 15 (quoting Trial Tr. at 1099:14-20).)  Certain of Defendant's witnesses *were* repeatedly impeached.  (*See, e.g.*, Trial Tr. at 867:13-869:5, 877:17-878:3 (Murphy), 544:7-545:24, 555:7-557:16, 574:11-575:14 (Hennessey).)  Even if Plaintiff's statement was inaccurate, however, "improper comments during closing argument rarely rise to the level of reversible error."  *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008).  The Court instructed the jury that attorney statements did not constitute evidence, and counsel's characterization of her attempts to impeach witnesses does not provide grounds for a new trial.

## IV.    The Court's Statement

Finally, Defendant argues that a statement the Court made when overruling one of the City's many objections was unduly influential on the jury.  (R. 524, Def.'s Mem. New Trial at 16-17.)  In support of its request for a new trial on this basis, Defendant quotes *United States v. Dellinger*, 472 F.2d 340, 386 (7th Cir. 1972), which held that "[j]udicial comments in the presence of the jury are subject to special scrutiny" and are less easily cured by cautionary instructions.  In *Dellinger*, the Seventh Circuit found that the trial judge exhibited a "deprecatory and often antagonistic attitude toward the defense" in both remarks and actions throughout the lengthy trial.  *Id.*  The judge's "comments were often touched with sarcasm, implying rather than saying outright that defense counsel was inept, bumptious, or untrustworthy, or that his case lacked merit. . . . [C]umulatively, they must have telegraphed to the jury the judge's contempt for the defense."  *Id.* at 387.

Here, in contrast, Defendant complains about a single comment the Court made.  (R. 524, Def.'s Mem. New Trial at 16-17.)  When Defendant objected to one of Plaintiff's exhibits, the Court asked Plaintiff how the document was relevant to the issues in the case.  (Trial Tr. at 53:18-54:4.)  Plaintiff responded: "That it shows that that was one of the functions of Chief Timekeeper that he was fulfilling."  (*Id.* at 54:5-6.)  The Court asked: "Okay.  And this goes to your issue of retaliation and pretext."  (*Id.* at 54:7-8.)  Plaintiff responded that it did, and the Court stated that it would overrule Defendant's objection on that basis.  (*Id.* at 9-11.)  Defendant's argument that the Court's clarifying comment "gave undue weight to the memos" in the exhibit and that "[b]ased on the unsupported verdict on Plaintiff's state law retaliatory discharge claim, the jury heeded the Court's words and found for Plaintiff on a claim that he

failed to prove," is simply unfounded in any legal principle.  The Court's single clarifying comment does not provide grounds for a new trial.

## V.  Cumulative Effect of Errors

Defendant contends that even if the foregoing errors do not individually warrant a retrial, their cumulative effect warrants a new trial.  (R. 524, Def.'s Mem. New Trial at 17.)  To prevail on an argument that the cumulative effect of errors warrants a new trial, Defendant "must show: (1) that multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered [its] trial fundamentally unfair." *Christmas v. City of Chi.*, 682 F.3d 632, 643 (7th Cir. 2012) (quoting *United States v. Powell*, 652 F.3d 702, 706 (7th Cir. 2011)) (internal quotation marks omitted).  In determining whether the alleged errors rendered the trial "fundamentally unfair," the Court must consider the nature and number of alleged errors, "their interrelationship, if any," and the efficacy of any curative measures.  *Id.*  (quoting *Powell*, 652 F.3d at 706).

The Court has thoroughly examined the trial record and has considered all of the errors Defendant alleges individually and in combination.  The Court concludes that sustaining the meritorious objections Defendant made at trial and instructing the jury to disregard improper testimony was sufficient to cure any errors.  Defendant's argument that the jury received a one-sided picture, (R. 537, Def.'s Reply New Trial at 7), is disingenuous and is belied by the verdict for Defendant on three of the four claims.  Examining the trial record as a whole, the Court does not find that the verdict "cries out to be overturned or shocks [the Court's] conscience." *Latino*, 58 F.3d at 315.  Consequently, the Court DENIES Defendant's motion for a new trial.  Finding no error that warrants a new trial or undermines the validity of the instant jury verdict, the Court also denies Defendant's request to reinstate the jury verdict from the first trial.

## DEFENDANT'S MOTION TO ALTER JUDGMENT

Finally, Defendant moves pursuant to Federal Rule of Civil Procedure 59 for remittitur or, alternatively, for an evidentiary hearing as to damages. (R. 515, Def.'s Mot. Alter J.) Defendant argues that the jury's award is "monstrously excessive, has no rational basis in the evidence, and drastically exceeds the compensatory damage awards in comparable cases." (R. 516, Def.'s Mem. Alter J. at 1.) The jury was instructed that if it found for Plaintiff on his state law retaliatory discharge claim, it must "fix the amount of money which will reasonably and fairly compensate him for any of the following elements of damages proved by the evidence to have resulted from the wrongful conduct of the Defendant[:] 1. The value of lost pension benefits; and 2. Mental/emotional pain and suffering." (R. 498, Jury Instructions at 34.) The jury awarded Plaintiff two million dollars on his state law retaliatory discharge claim.

First, the Court must determine how much, if any, should be set off from the award. Plaintiff stipulated that his pension expert, DeBrock, did not consider workers' compensation benefits in his analysis, and the parties agreed that the Court should set off Plaintiff's workers' compensation award from the award of any lost pension benefits. (R. 487, Pl.'s Mot.; Trial Tr. at 368:11-370:17, 512:7-13.) DeBrock testified that the present value of Plaintiff's lost pension benefits, assuming Plaintiff had retired at age 55, was $1.2 million. (Trial Tr. at 374:8-10.) From the enormity of the jury award and the lack of any substantive evidence as to Plaintiff's compensatory damages except for DeBrock's testimony about pension loss, the Court concludes that the jury award included $1.2 million in compensation for Plaintiff's pension loss. The Court must now determine how much to set off.

Defendant first argues, however, that the Court should not allow Plaintiff to receive any lost pension benefits because Plaintiff was judicially estopped from seeking lost pension

benefits. (R. 516, Def.'s Mem. Alter J. at 5-6.) In 2008, Judge Andersen found that Plaintiff was judicially estopped from recovering back pay or front pay because he represented to the Illinois Workers' Compensation Commission that he was permanently and totally disabled as of September 4, 2002, and could not work at any job from that date forward. (R. 223, Mem. Op. & Order at 4.) The Illinois Workers' Compensation Commission accepted Plaintiff's position and awarded him total and permanent disability benefits of $716.86 per week for life. (*Id.* at 2-4.) Accordingly, Judge Andersen held that Plaintiff was barred from receiving back pay and front pay to prevent him from being overcompensated for his disability. (*Id.* at 4.) Defendant argues that Plaintiff is not entitled to any lost pension benefits because pension benefits are front pay. (R. 516, Def.'s Mem. Alter J. at 5-6.) Defendant provides no legal support for this claim, and the Court declines to take it at face value. Pension is not necessarily the same thing as front pay, and in fact the case Defendant does cite distinguishes between front pay and front benefits such as pension. *Best v. Shell Oil Co.*, 4 F. Supp. 2d 770, 776 (N.D. Ill. 1998). Thus, the Court concludes that Judge Andersen's previous ruling does not estop Plaintiff from seeking lost pension benefits.

Defendant next argues that Plaintiff was not entitled to lost pension benefits because he withdrew all the money from his pension account in 2005. (R. 516, Def.'s Mem. Alter J. at 6.) Defendant contends that if he had not withdrawn the money, he "would have been able to begin collecting a pension in the amount of $2,091.00 per month beginning on July 28, 2009, at the age of 55." (*Id.*) Defendant thus argues that any injury Plaintiff suffered as a result of withdrawing the money in his pension account was too remote and unforeseeable a consequence to have been caused by his termination, and the City is not liable. (*Id.*) "A foreseeable intervening cause does not break the chain of legal causation and to avoid liability, a defendant must show that the

intervening event was unforeseeable as a matter of law." *Calloway v. Bovis Lend Lease, Inc.*, 995 N.E.2d 381, 406 (Ill. App. Ct. 1st Dist. Jan. 2014), *appeal denied*, 2014 WL 466522 (Ill. Jan. 29, 2014). The Court agrees with Defendant that, based on the size of the award, the jury probably held the City accountable for the necessity Plaintiff testified he faced of withdrawing money from his pension fund in order to pay his bills. (*See* R. 516, Def.'s Mem. Alter J. at 6. ) The jury was presented with Plaintiff's testimony that he withdrew his entire pension contribution because he needed that money, along with loans from relatives, in order to pay bills after his termination. (Trial Tr. at 220:2-7, 353:1-8.) Defense counsel cross-examined Plaintiff extensively about his pension contributions and account and his attempts to mitigate his pension loss. (Trial Tr. at 347-352.) Defendant presented expert testimony by Tessaro about the ramifications of Plaintiff's withdrawal and argued in closing that it was Plaintiff's fault he had no pension benefits to rely on. (Trial Tr. at 1145:17-1146:19.) The jury was thus presented with evidence on Plaintiff's decision to withdraw his pension benefits, and it evidently determined that Defendant was liable for his loss. The Court is not to disrupt the jury's determination without good cause, *Richardson v. Chapman*, 676 N.E.2d 621, 628 (Ill. 1997), and the Court finds that Plaintiff was entitled to the lost pension benefits the jury awarded. The Court turns now to the issue of the set-off.

Defendant contends, and presents evidence to support, that Plaintiff had received $433,748.92 in workers' compensation payments as of May 3, 2013. (R. 516, Def.'s Mem. Alter J. at 13; R. 516, Ex. I, Comm. on Finance Payments.) Defendant also contends that, according to Plaintiff's life expectancy as projected by his expert, Professor DeBrock, Plaintiff will receive $828,701.72 in future workers' compensation payments. (R. 516, Def.'s Mem. Alter J. at 13.) Thus, assuming the jury award of $2 million includes lost pension benefits, as Defendant argues,

the Court should set off the $1,262,450.64 Plaintiff will receive in workers' compensation benefits in lieu of pension benefits. (*Id.*) Plaintiff did not respond to Defendant's instant motion or provide any contradicting evidence, so the Court assumes that Plaintiff agrees with Defendant's offset figures and finds that he has waived any objection. The purpose of compensatory damages is to compensate plaintiffs justly, not to award a windfall. *Heldenbrand v. Roadmaster Corp.*, 660 N.E.2d 1354, 1360 (Ill. App. Ct. 5th Dist. 1996). Allowing Plaintiff to recover both pension benefits and lifetime workers' compensation benefits would overcompensate him. Accordingly, the Court finds it appropriate to offset the jury award by $1.2 million to avoid awarding Plaintiff a windfall.

Having set off the workers' compensation payments, the Court examines whether the remaining $800,000 representing non-pecuniary compensatory damages is excessive. Defendant argues that it is excessive and requests the Court to either reduce the jury award to $15,000 or less or "hold an evidentiary hearing to determine the actual value of Plaintiff's purported lost pension benefits." (R. 516, Def.'s Mem. Alter J. at 13.) Because the Court determined that the jury award included $1.2 million of Plaintiff's purported lost pension benefits, and set off that amount from the award, the Court does not need to hold an evidentiary hearing to determine the value of the pension benefits.

The jury awarded Plaintiff damages only on his state law claim, so Illinois state law governs Defendant's motion for remittitur. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 611 (7th Cir. 2006). Although courts in the Seventh Circuit typically compare a damages award with damages awards in similar cases, *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 408 (7th Cir. 2010), as Defendant urges this Court to do, that is not the practice in Illinois courts, *Richardson*, 676 N.E.2d at 628 (collecting cases). "The determination of damages is a question

reserved to the trier of fact, and a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court." *Richardson*, 676 N.E.2d at 628. In Illinois, "all the law requires is that the evidence tend to establish, with a fair degree of probability, a basis for the assessment of damages." *F.L. Walz, Inc. v. Hobart Corp.*, 586 N.E.2d 1314, 1319 (Ill. App. Ct. 3d Dist. 1992). It is appropriate, however, to reduce an award to prevent a departure from the evidence presented at trial. *Richardson*, 676 N.E.2d at 628. "An award of damages will be deemed excessive if it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience." *Id.* (citing *Richter v. Nw. Mem'l Hosp.*, 532 N.E.2d 269 (1988)). If the court finds the award to be excessive, it may order a remittitur with the plaintiff's consent; if the plaintiff does not consent, the court must order a new trial to be held on damages. *Best v. Taylor Mach. Works*, 689 N.E.2d 1057, 1080 (Ill. 1997).

Having removed loss of pension from the equation, the jury award consisted solely of damages for pain and suffering. When asked how it made him feel to have to withdraw money from his pension in order to pay bills, Plaintiff stated, "Not too good. I mean I lost my pension." (Trial Tr. at 220:9.) He further testified that he was barely able to support himself and that he had to borrow money from relatives in order to make ends meet. (Trial Tr. at 219:4-17.) Plaintiff testified that he did not discuss his termination or how it made him feel with his wife or with any clergy or mental health professional. (Trial Tr. at 353:22-354:8.) Although Plaintiff tried to present a stoic front, the evidence presented at trial clearly demonstrated that he suffered mental and emotional distress from the retaliatory discharge, which began when he was demoted at work. (*See* Trial Tr. at 99:14-23.) For example, when Plaintiff was ordered to take a leave of absence in December of 2000, he put off telling his wife until after Christmas because he "didn't

want to ruin her Christmas."  (Trial Tr. at 99:17-23.)  Additionally, Plaintiff testified that he could not afford not to work because he needed the money for his house payments and his children's schooling.  (Trial Tr. at 211:21-212:1.)  Such evidence is proof that Defendant's mistreatment caused Plaintiff mental and emotional pain and suffering, for which the jury awarded compensatory damages.

While the Court sympathizes with the emotional distress Plaintiff must have felt after being terminated, however, the evidence presented at trial was insufficient to support an award of $800,000.  "There is no exact standard for setting the damages to be awarded on account of pain and suffering," but the damages must be fair and reasonable.  (R. 498, Jury Instructions at 36); *see Richardson*, 676 N.E.2d at 628.  Consequently, the Court concludes that the jury award is excessive and finds it appropriate to reduce the award to $400,000.  "The purpose of compensatory damages is to compensate the plaintiff for damages sustained, not to punish the defendant or to award a windfall to the plaintiff."  *Heldenbrand*, 660 N.E.2d at 1360.  This Court has great respect for the work of juries in general, and this jury specifically, and has only rarely modified a jury verdict in nearly twenty years of judicial service.  Yet because damages for emotional pain and suffering must be reasonable, the Court is compelled to enter this substantial remittitur.  The Court concludes that a $400,000 award is not punitive or excessive given the evidence presented at trial and remains as faithful to the jury's original award as the Court can in good conscience.  If Plaintiff refuses to accept the remittitur, the Court will hold an evidentiary hearing as to damages.

## CONCLUSION

For the reasons set forth above, Defendant's motion to issue findings of fact and conclusions of law (R. 521) is GRANTED; Plaintiff's motion to partially vacate Judgment (R. 503) is DENIED; Defendant's renewed motion for judgment as a matter of law (R. 508) is DENIED; Defendant's motion for a new trial or to reinstate the first jury verdict (R. 511) is DENIED; and Defendant's motion for remittitur or for an evidentiary hearing as to damages (R. 515) is GRANTED.  The Court hopes that with these rulings, this ten-year-old case, which has gone on for far too long, will finally be put to rest.

ENTERED: _____
**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: March 31, 2014**